Maile Tavepholjalern
Hannah M. Payne
EARTHJUSTICE
441 W 5th Avenue Suite 301
Anchorage, AK 99501
T: 907.277.2500
E: mtave@earthjustice.org
E: hpayne@earthjustice.org

*Attorneys for Plaintiffs Orutsararmiut Native Council; Tuluksak Native Community; and Organized Village of Kwethluk.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| ORUTSARARMIUT NATIVE COUNCIL; TULUKSAK NATIVE COMMUNITY; and ORGANIZED VILLAGE OF KWETHLUK; | ) )  Case No. 3:23-cv-00071-HRH ) |
| *Plaintiffs*, | ) ) ) |
| v. | ) ) |
| UNITED STATES ARMY CORPS OF ENGINEERS; UNITED STATES BUREAU OF LAND MANAGEMENT; UNITED STATES DEPARTMENT OF THE INTERIOR; COLONEL DAMON DELAROSA, in his official capacity as Commander, Alaska District, United States Army Corps of Engineers; LAURA DANIEL-DAVIS, in her official capacity as Principal Deputy Assistant Secretary, Land and Minerals Management, United States Department of the Interior; STEVEN COHN, in his official capacity as State Director, Bureau of Land Management, Alaska, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| *Defendants*. | ) ) |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
**(5 U.S.C. §§ 701-706; 42 U.S.C. § 4332; 16 U.S.C. § 3120; 33 U.S.C. § 1344)**

**INTRODUCTION**

1.      This case challenges the final environmental impact statement (FEIS) for the Donlin Gold Mine project ("Donlin project") and various authorizations made pursuant to it.  Plaintiffs Orutsararmiut Native Council, Tuluksak Native Village, and Organized Village of Kwethluk (the Tribes) bring this case under the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332; the Alaska National Interest Lands Conservation Act (ANILCA), 16 U.S.C. § 3120; and the Clean Water Act, 33 U.S.C. § 1344.  The Tribes challenge the FEIS and the joint record of decision (JROD) issued by Defendants, the permit issued by the U.S. Army Corps of Engineers (Corps) allowing filling of wetlands, and a right-of-way authorization for a pipeline issued by the U.S Bureau of Land Management (BLM) and the U.S. Department of the Interior.

2.      Development of the Donlin project would harm the Kuskokwim River and its surrounding lands and waters.  The Tribes, their citizens, relatives, and social relations have relied on these lands and waters since time immemorial, and continue to do so, for food, drinking water, culture, ceremony, passing on language and traditions, and other uses.  Mine development would limit subsistence uses and imperil ecosystems and fisheries in the Kuskokwim River and its surrounding lands and waters, with impacts on people and communities throughout the Yukon-Kuskokwim region.  Mine development would introduce the risk of catastrophic tailings or chemical spills.  It would also increase the risk of death and injury from barging accidents by tripling the number of barges on

the Kuskokwim River, with each barge for the Donlin project up to four times as large as current barges.

3.    The Donlin project as approved by the Corps, BLM, and the U.S. Department of the Interior would constitute the largest pure gold mine in the world. It would introduce industrial-scale mining to the Kuskokwim River basin. A 316-mile buried natural gas pipeline, crossing nearly 100 miles of BLM-managed lands and hundreds of streams and rivers including the middle fork of the Kuskokwim River, would power mining operations. Barges would carry cyanide, diesel, and other cargo to a new port by the mine site and remove canisters of mercury and mercury-loaded carbon. The Donlin project's industrial mining activities include dewatering more than a thousand acres of wetlands and a salmon-bearing stream, filling thousands of acres of wetlands, damming additional fish-producing streams and filling others with tailings, excavating waste rock and ore, crushing and grinding ore, and using heat and cyanide to separate gold from mercury.

4.    The mine would require construction of a 471-foot high earthen tailings dam to hold up to 568 million tons of tailings. It is foreseeable that a catastrophic failure could occur, releasing 20 to 40 percent of the tailings capacity. Despite this risk, the Corps and BLM never examine it. Both agencies consider a spill of just 0.5 percent of the tailings capacity. This failure violates NEPA and ANILCA and infects the Corps' environmental analysis and BLM's analysis of subsistence impacts.

5.      The Corps also downplays the risks to human health in the FEIS.  It never discloses the health analysis by the state public health authority that found serious health concerns with the Donlin project.  Instead, for negative health effects identified by the state public health authority, the Corps generally downgrades their severity or discounts their likelihood.  The Corps rates positive impacts as similarly positive or more positive.

6.      The FEIS also predicts significant negative impacts from Donlin's barges to Kuskokwim River rainbow smelt—an important subsistence and prey species.  Clean Water Act section 404 requires the Corps to prevent these predicted impacts.  But the Corps does nothing to mitigate them.  It instead relies on procedural measures such as collecting baseline information, having meetings and committees, and notifying communities of incoming barges.

7.      By failing to examine a catastrophic tailings spill or disclose the contrary findings of the state health authority about the human health impacts of the Donlin project, the FEIS and JROD do not provide sufficient information to enable informed decision-making, public participation, or meaningful tribal consultation.  The Corps' reliance on basic monitoring, committees, and communication fails to adequately protect Kuskokwim River rainbow smelt and other important subsistence and environmental resources.

## JURISDICTION, RIGHT OF ACTION, AND VENUE

8.      This court has jurisdiction under 28 U.S.C. § 1331 (federal question),

28 U.S.C. § 1346 (civil actions against United States), and 28 U.S.C. § 1362 (civil actions by federally recognized tribes). It may issue a declaratory judgment and further relief under 28 U.S.C. §§ 2201-2202. Judicial review is available under the Administrative Procedure Act, 5 U.S.C. § 701-706.

9. Venue is proper under 28 U.S.C. § 1391(e).

## PLAINTIFFS

10. Plaintiff Orutsararmiut Native Council (ONC) is a federally recognized sovereign tribe. The ONC Tribal Council is the governing body of the Native Village of Bethel and serves over 3,900 Tribal citizens. The Tribe's mission includes promoting the general welfare of the Tribe, preserving the Tribe's traditional and cultural values, and exercising tribal authority over resources through educational, economic, and social development opportunities. The Tribe has passed a resolution opposing development of the Donlin project.

11. Plaintiff Tuluksak Native Community is a federally recognized sovereign tribe. The Tuluksak Village Council is the governing body for the Tuluksak Native Community. The Tuluksak Native Community has inherent authority to protect and preserve *yuyaraq* or the Yup'ik way of life, key components of which are well-being, health and welfare, and food security. The Tribe has passed a resolution opposing the development of the Donlin project.

12. Plaintiff Organized Village of Kwethluk is a federally recognized sovereign

Case 3:23-cv-00071-JMK   Document 1   Filed 04/05/23   Page 5 of 29

tribe.  The Kwethluk IRA Council is the governing body for the Organized Village of Kwethluk and serves about 1,300 Tribal citizens.  The Tribe's powers include fostering and guarding Alaska Native ways of life and customs and providing for the common good of the Tribe.

13.    Citizens of the Tribes, their relatives, and their social relations reside along the Kuskokwim River downstream of the Donlin project mine site and elsewhere throughout the Yukon-Kuskokwim region.  As their ancestors have done for thousands of years, they use the Kuskokwim River, its banks and tributaries, and surrounding wetlands, streams, lakes, and other water bodies and lands for: subsistence fishing, hunting, and gathering; food preparation and food storage; drinking water; ceremony; travel; trade; and passing on language and culture to future generations.  Development of the Donlin project—including intensive barging, an underground pipeline crossing hundreds of streams and rivers, and storing and transporting chemicals, fuel, and waste—will directly and irreparably harm these activities.

14.    The Tribes monitor ecosystems and fisheries, and conduct cleanup of contaminated sites.  The Tribes educate their citizens, including youth, on issues relating to natural resources.  They advocate for policies on their citizens' behalf, including for policies that protect clean water, subsistence practices and the ecosystems they rely on, and the culture and ways of life of the Tribes.  The Tribes collaborate on these and related issues with other tribes and tribal entities throughout the Yukon-Kuskokwim region.  The

Tribes, along with other tribes in the region, have formed regional tribal nonprofit consortia—the Association of Village Council Presidents (AVCP) and the Yukon Kuskokwim Health Corporation (YKHC)—to deliver social services and healthcare services throughout the region. Both AVCP and YKHC have adopted resolutions opposing the Donlin project. The Tribes' organizational purposes are frustrated by Defendants' failure to provide required information and to comply with the law when analyzing and authorizing the Donlin project.

15. The Tribes have participated in multiple administrative processes relating to the Donlin project. They have submitted comments on the draft environmental impact statement (DEIS) and on numerous other proposed actions relating to the mine. They have met with federal agencies. They have met with state agencies when permitted. They have served as consulting parties to the Donlin Programmatic Agreement under the National Historic Preservation Act. The Tribes have organized and participated in educational and informational opportunities to communicate with their members and the public about the Donlin project. These efforts have included panels, op-eds, meetings, surveys, responding to media inquiries, and community events. The Tribes have exhausted administrative remedies for the decisions by Defendants. The Tribes seek declaratory and injunctive relief preventing Defendants from proceeding with unlawful actions that directly and irreparably harm the environment, subsistence, human health, ways of life, and culture.

16. Defendant Corps is a branch of the United States Army, part of the United States Department of Defense. The Corps is authorized to issue permits for the discharge of dredged or fill material into waters of the United States under section 404 of the Clean Water Act. 33 U.S.C. § 1344(a). It is also responsible for regulating the building of structures in, over, or under navigable waters under section 10 of the Rivers and Harbors Act. 33 U.S.C. § 403.

17. Defendant BLM is an agency within the United States Department of the Interior. It is responsible for managing federal public lands. Lands under the jurisdiction of BLM include approximately 97 miles that would be crossed by a pipeline to power the Donlin project.

18. Defendant United States Department of the Interior is responsible for overseeing its agencies, including BLM, and helping to ensure they comply with federal law and policy.

19. Defendant Colonel Damon Delarosa is sued in his official capacity. Colonel Delarosa is the Commander for the Alaska District, Corps. His predecessor, Colonel Michael Brooks, signed the JROD approving a Corps permit for the Donlin project under section 404 of the Clean Water Act and section 10 of the Rivers and Harbors Act and signed the Corps permit at issue in this case.

20. Defendant Steven Cohn is sued in his official capacity as the State Director

*Orutsararmiut Native Council et al. v. U.S. Army Corps of Eng'rs et al.,*
Case No. 3:23-cv-00071-HRH                                                          7

for BLM, Alaska.  His predecessor, Acting State Director Karen Mouritsen, signed the JROD recommending approval of a right-of-way across BLM lands for the natural gas pipeline and fiber optic cables for the Donlin project.

21.     Defendant Laura Daniel-Davis is sued in her official capacity as Principal Deputy Assistant Secretary, Land and Minerals Management, United States Department of the Interior.  Defendant Daniel-Davis currently is the highest-ranking individual in Land and Mineral Management.  Her predecessor, Assistant Secretary of the Interior for Land and Minerals Management Joseph Balash, signed the JROD approving a right-of-way across BLM lands for the natural gas pipeline and fiber optic cables for the Donlin project.

## FACTS

22.     The Kuskokwim River basin, located in the Yukon-Kuskokwim region in remote southwest Alaska, comprises about 11 percent of Alaska's land area.  The Yukon-Kuskokwim region is the traditional homeland of Yup'ik, Cup'ik, and Athabascan people, including the Tribes and their ancestors.  The Tribes' ancestral lands and waters encompass the Yukon-Kuskokwim Delta, including the Kuskokwim River, its tributaries, and surrounding waters and lands.  The Yukon-Kuskokwim region is the homeland today of up to 58 federally recognized tribes.  The region contains the greatest number of tribes of any region in Alaska.

23.     The Kuskokwim River, its tributaries, wetlands, and surrounding lands and

waters continue to support numerous tribes, people, fish, wildlife, and plants. The Tribes and others use water from the Kuskokwim River for drinking, cleaning fish, ceremony, and other uses. All five species of Pacific salmon, sheefish, pike, whitefish, rainbow smelt, and other aquatic species are found in the Kuskokwim River and its tributaries. The Yukon Delta National Wildlife Refuge, located between the Yukon and Kuskokwim rivers, is a flyway of hemispheric importance for migratory shorebirds important to ecosystems and traditional and subsistence practices. It is also a flyway for numerous migratory waterbirds important to ecosystems and traditional and subsistence practices. Numerous native plants, including greens and berries, are located in the Kuskokwim River basin. The Tribes' citizens, their relatives, and their social relations harvest plants along with migratory birds and their eggs for subsistence, cultural, and traditional uses. They travel the Kuskokwim River and its tributaries to fish, hunt, recreate, visit relatives, and trade. Communities from the mouth of the Kuskokwim to nearly 200 miles upriver come to the Kuskokwim River to fish. The Tribes, their citizens, and ancestors have used these resources for millennia for food, water, medicine, ceremony, and other purposes.

24. The Yukon-Kuskokwim region has limited industry. No roads lead into the region. Travel into the region is typically by boat or plane. The Tribes already contend with the effects of historic small-scale mining and exploration along with related infrastructure. There is no industry in the Yukon-Kuskokwim region the size or scale of the Donlin project. The Donlin project would be the first mine in the Yukon-Kuskokwim

region to employ industrial-scale mining processes.

25.     The Donlin project would be an open pit mine.

26.     The Donlin project would be the largest pure gold mine in the United States.

27.     The Donlin project would be the largest pure gold mine in the world.

28.     The Donlin project would be one of the largest gold mines in the world.

29.     The construction and operation period for the Donlin project would be more than 30 years. The construction phase for the Donlin project would last three to four years.  The operations phase for the Donlin project is estimated to last 27.5 years.

30.     The Donlin project mine site would be powered largely by a 316-mile underground pipeline.  The pipeline would deliver natural gas from Cook Inlet through the Alaska Range to the Donlin project.  The pipeline would deliver natural gas produced in Cook Inlet.  Approximately 97 miles of pipeline would cross public lands managed by BLM.  The pipeline would cross beneath hundreds of streams and the middle fork of the Kuskokwim River.

31.     Donlin Gold, LLC (Donlin) has not specified where in Cook Inlet it will source natural gas.  Donlin has not contracted with a supplier of natural gas for the Donlin project.  Donlin has not identified a supplier of natural gas for the Donlin project.

32.     Donlin barges would carry diesel, supplies for the mine, and mine waste. Donlin would barge approximately 42 million gallons of diesel and 2,618 tons of cyanide

*Orutsararmiut Native Council et al. v. U.S. Army Corps of Eng'rs et al.,*
Case No. 3:23-cv-00071-HRH                                                            10

annually. Donlin would barge approximately 11 tons of liquid mercury and 29 tons of mercury-loaded carbon annually. Mercury is not currently used or transported in the Kuskokwim River basin. Cyanide is not currently used or transported in the Kuskokwim River basin. Donlin barges would traverse around 200 miles of the Kuskokwim River. Donlin barges would make approximately 122 round trips on the river per open-water season. This amounts to two to three Donlin barges passing per day. Donlin operations would nearly triple the number of barges on the Kuskokwim River. Donlin barge tows would be up to four times as large as current barge-tow configurations. The number of barge trips would increase if barges need to be decoupled. Donlin's barging would occur at the height of the subsistence fishing, hunting, and gathering season.

33. Due to the microscopic nature of the gold at the mine site, Donlin would need to excavate billions of tons of waste rock and ore to produce about 33 million ounces of gold. This action would create two pits that eventually become a single pit. To help prevent the pit walls from collapsing, Donlin must conduct extensive pumping to dewater the pit.

34. A natural gas- and diesel-fired power plant would power much of Donlin's mine processing operations, including crushing, grinding, and chemically extracting the gold. The Donlin power plant would be larger than that needed to power the city of Fairbanks. The Donlin power plant would be larger than Anchorage's Chugach Electric Association's Southcentral Power Project in Anchorage. During the project's active life,

Case 3:23-cv-00071-JMK   Document 1   Filed 04/05/23   Page 12 of 29

it would be the largest mine emitter of greenhouse gases in Alaska. On a per capita basis, Alaska is the fourth largest emitter of greenhouse gases in the nation.

35. After the project's active life, the mine site would include the following features:

    a. A waste rock mountain about four square miles in area.

    b. A 471-foot-high tailings dam that can hold 568 million tons of tailings.

    c. A pit lake holding contaminated water. The lip of the pit lake would be less than 0.25 miles from Crooked Creek. Crooked Creek is a tributary of the Kuskokwim River. The pit lake would receive tailings porewater, acid mine drainage from the waste rock mountain and other sources, runoff from the pit walls, and groundwater. Once the lake has filled, the pit lake would require pumping and treating in perpetuity. The purposes of perpetual pumping and treating are to prevent the pit lake from overtopping and to create a hydraulic sink to prevent off-site migration of contaminated groundwater. The pit lake would not be covered.

36. The Donlin project is operated by Donlin, a company incorporated under Alaska state law. Donlin is owned 50-50 by two Canadian mining companies, Barrick Gold Corporation and NOVAGOLD.

37. Surface rights at the Donlin project mine site are primarily owned by The Kuskokwim Corporation (TKC) and leased to Donlin. TKC is a group of 10 for-profit

village corporations that are authorized under the Alaska Native Claims Settlement Act (ANCSA) and incorporated under Alaska state law.

38.     Subsurface rights at the Donlin project mine site are owned by Calista Corporation (Calista) and leased to Donlin.  Calista is a regional for-profit corporation authorized under ANCSA and incorporated under Alaska state law.

39.     The Donlin project would cause significant, irreparable harm to the Tribes. Development of the Donlin project directly endangers the health, safety, and welfare of the Tribes and their citizens.  This includes by curtailing access to healthy traditional and subsistence foods, increasing the risk of accidental injury and death on the Kuskokwim River, increasing exposure to potentially hazardous materials, increasing the rates of sickness and death from chronic diseases, and decreasing access to health care in the region.

40.     The nearly 200 percent increase in barging would disrupt the use of the Kuskokwim River for subsistence hunting and fishing.  Donlin's barging would increase the risk of human accidents and could cause population-level impacts to Kuskokwim River rainbow smelt, an important subsistence and forage species.  In the last few years, salmon populations across multiple species in both the Yukon and Kuskokwim rivers have crashed.  Mine operations would dewater, divert, and fill salmon spawning streams. This would further deepen the negative effects of the ongoing salmon crashes in the region.  Mine operations would directly and indirectly contribute to the compounding

Case 3:23-cv-00071-JMK   Document 1   Filed 04/05/23   Page 14 of 29

effects of climate change, permafrost thaw, and erosion in the region. The barging of toxic chemicals and mine waste and their storage at the mine site increases the risk of contamination on the Kuskokwim River, its tributaries, and surrounding lands and waters. These threats pose severe risks to drinking water, multiple traditional resources, the Tribes' culture, and the Tribes' existence.

41.     The Tribes, along with many other tribes, AVCP, and YKHC have concluded that the risks to human health, traditional ways of life, and culture outweigh the potential economic benefits of the mine.

## Procedural Background

42.     In the late 2000s, Donlin announced its intent to apply for a Corps permit under section 404 of the Clean Water Act and section 10 of the Rivers and Harbors Act. By 2010, the Alaska Department of Health and Social Services (DHSS) elected to do a comprehensive Health Impact Assessment (HIA) for the Donlin project. DHSS is the state public health authority for Alaska. DHSS hired a contractor and enlisted tribal health authorities, including YKHC, to assist it in completing the HIA. The goal of an HIA is to provide information to decisionmakers by evaluating the potential positive and negative health effects of a project, ranking the effects, and providing recommendations on actions and monitoring for the highest-rated health impacts. The DHSS HIA would cover Alaska's eight standard health effect categories: (1) social determinants of health; (2) accidents and injuries; (3) exposure to potentially hazardous materials; (4) food,

nutrition, and subsistence; (5) infectious diseases; (6) chronic and non-communicable diseases; (7) water and sanitation; and (8) health services infrastructure and capacity.

43.     In 2012 Donlin applied for a Corps permit under section 404 of the Clean Water Act and section 10 of the River and Harbors Act.  In July 2012 and January 2013 Donlin applied to BLM for a right-of-way lease.

44.     In 2013 the Corps requested the State of Alaska prepare an HIA.

45.     In 2014 the Mount Polley tailings dam failed in British Columbia, Canada. The dam failure released between 10 to 20 percent of the tailings dam's capacity.  The failure released approximately 25 million cubic meters of tailings, water, and construction materials.  Portions of the lake beds of both Polley Lake and Quesnel Lake, the largest fjord lake in the world and which flows to the Fraser River and the Pacific Ocean, were buried by tailings.  Tailings debris blocked fish passage.  Since the disaster, copper concentrations in waters associated with the spill have exceeded background levels by an order of magnitude.  Aquatic species living in waters affected by the spill have higher concentrations of heavy metals than those that live in unaffected waters. Long-term impacts of the Mount Polley tailings spill to the ecology of Quesnel Lake are still unknown.

46.     The Corps issued the DEIS for the Donlin project on November 27, 2015.

47.     On May 24, 2016, the State of Alaska provided the most recent version of the DHSS HIA to the Corps.  The 2016 HIA finds serious concerns with chronic disease,

food security and subsistence, and industry-related accidents, among others.

48.     The Corps received more than 5,000 comments on the DEIS.

49.     On May 31, 2016, the Environmental Protection Agency (EPA) sent a Clean Water Act section 3(a) letter informing the Corps that the Donlin project "may" cause substantial and unacceptable adverse effects to aquatic resources of national importance, including the Kuskokwim River.  On June 27, 2016, the EPA issued a Clean Water Act section 3(b) letter informing the Corps that the Donlin project "will" cause substantial and unacceptable adverse effects to aquatic resources of national importance, including the Kuskokwim River.  The EPA, however, declined to elevate the issue further.

50.     The Corps issued the FEIS for the Donlin project on April 27, 2018.  It included BLM's final ANILCA section 810 analysis.  The FEIS analyzed six action alternatives, including Donlin's proposed action.  Three action alternatives would have decreased barging from the level estimated in Donlin's proposed action.  One action alternative would have reduced the consequences of a tailings failure by requiring dry stack tailings.  The Corps provided the public notice of the availability of the FEIS and one month to review and submit comments on an updated compensatory mitigation plan. Commenters submitted comments on the FEIS and the compensatory mitigation plan.

51.     On August 13, 2018, representatives of the Corps, BLM, and the U.S. Department of the Interior signed the JROD for the Donlin project.  The District

Commander for the Alaska District of the Corps signed the JROD, authorizing the issuance of a Corps permit to Donlin. The Acting State Director for BLM, Alaska, signed the JROD recommending issuance of a right-of-way to Donlin. The Assistant Secretary of the Interior for Land and Minerals Management signed the JROD authorizing issuance of a right-of-way to Donlin.

52. On August 13, 2018, the Alaska District Commander also signed a Corps permit for Donlin authorizing activities under section 404 of the Clean Water Act and section 10 of the Rivers and Harbors Act.

53. BLM offered Donlin a right-of-way lease. BLM made an offer of a right-of-way lease to Donlin in August 2018. Donlin accepted BLM's offer of a right of way lease. BLM issued a right-of-way lease to Donlin.

54. Donlin has received the authorizations necessary for it to legally begin construction of major components of the Donlin project.

55. Donlin has not yet begun construction of the mine. Donlin's delay is due in part to concerns regarding the price of gold. Donlin's delay is also due to concerns about the high cost of infrastructure.

**FEIS – Flawed Tailings Spill Analysis**

56. The FEIS includes Defendants' environmental and subsistence analyses under NEPA and ANILCA. The FEIS also contains some of the Corps' environmental analysis under the Clean Water Act.

57.     The FEIS considers the environmental impacts of a spill of 0.5 percent of the tailings capacity of the Donlin project.  It does not examine the environmental impacts of a spill of any larger size.

58.     The FEIS reasons that a catastrophic spill is "very unlikely."  The FEIS classifies "very unlikely" events as having a probability of less than a 2 percent chance of occurring over 20 years.

59.     BLM's ANILCA section 810 subsistence analysis is based on the FEIS prepared by the Corps.  BLM considered the subsistence impacts of a spill of 0.5 percent of the total tailings capacity.  BLM's ANILCA section 810 analysis acknowledges that a 0.5 percent tailings spill would have major impacts to subsistence resources for the entire Kuskokwim River watershed.  BLM's ANILCA section 810 analysis declines to find that a 0.5 percent tailings spill would cause a significant restriction to subsistence uses. BLM's ANILCA section 810 analysis does not consider a catastrophic tailings dam spill.

### FEIS - Flawed Human Health Analysis

60.     The DEIS does not disclose the findings, conclusions, or recommendations of DHSS's 2016 HIA.

61.     The FEIS includes an analysis of the human health impacts of the Donlin project.  The FEIS explains that its analysis follows State of Alaska and international guidance on preparation of HIAs.  The FEIS covers the same eight health effect categories as the 2016 HIA.  The FEIS also uses near-identical intensity and likelihood

scales to rate health effects as the 2016 HIA.

62.     The FEIS cites the 2016 HIA for baseline health information and background references.  The FEIS does not disclose that its human health conclusions differ from the 2016 HIA's findings, conclusions, and recommendations about the Donlin project's effects on human health.

63.     The health impact findings of the FEIS are substantially more positive than those of the 2016 HIA.  In general, for health effects identified as negative in the 2016 HIA, the FEIS downgrades their severity or discounts their likelihood.  For the few health effects that the 2016 HIA identifies as a benefit, the FEIS provides a similar or elevated positive rating or an increased likelihood of occurrence.

64.     Under established State of Alaska guidance for conducting HIAs, intensity and likelihood ratings are then combined into a single categorical importance rating.  The categorical importance ratings in the 2016 HIA and the FEIS range from Category 1 (least negative/beneficial) to Category 3 (most negative/beneficial).  A Category 3 negative impact requires recommendations that decision-makers develop and implement actions to reduce negative impacts.  The 2016 HIA identifies the following four Category 3 negative impacts: increase in chronic non-communicable diseases and related deaths; increase in injury and death due to surface and air transportation accidents; increase in injury and death due to water transportation accidents; and decrease in percent of food secure households and subsistence consumption.  The FEIS identifies no negative health

impacts as Category 3. The only Category 3 impacts the FEIS identifies are positive.

<strong>Kuskokwim River Rainbow Smelt</strong>

65.     Kuskokwim River rainbow smelt are a small, anadromous subsistence fish. Rainbow smelt are important to the Kuskokwim River, the Tribes, and other communities that use the river and its surrounding lands and waters. Rainbow smelt are important as a forage fish for other species relied upon for subsistence and other traditional uses. These predator species include harbor seals, pike, sheefish, and others.

66.     Kuskokwim River rainbow smelt return to the Kuskokwim River to spawn. The Kuskokwim River rainbow smelt typically spawn in the Kuskokwim River mainstem. The precise spawning location varies from year to year. The spawning period for Kuskokwim River rainbow smelt occurs after breakup, usually in late May. The spawning run for rainbow smelt typically lasts several days, lasting in any one location for a few hours or a few days. Rainbow smelt eggs that spawn in late May typically incubate for about 21 days. Rainbow smelt larvae then float out to the estuary.

67.     Donlin intends to barge throughout the entire open-water season on the Kuskokwim River. Naturally occurring Kuskokwim River low flows will limit Donlin barge travel at times. Historically, June is the time of year when the Kuskokwim River flows have been highest. The Corps has not required that Donlin stop barging for fishing openers. Donlin has represented that it is unwilling to stop barging during fishing openers. Nor has the Corps required stopping barging for the rainbow smelt spawning

Case 3:23-cv-00071-JMK   Document 1   Filed 04/05/23   Page 21 of 29

and incubation period in May and June.

68.　　Propeller wash from Donlin's barges could kill or injure Kuskokwim River rainbow smelt eggs and their larvae.　Donlin barges' propeller wash could also wash Kuskokwim River rainbow smelt eggs downstream, preventing them from being fertilized.

69.　　Had Donlin's barges been running in 2015, they could not have avoided the area in the Kuskokwim River where rainbow smelt spawned that year.　That could have resulted in population-level impacts to Kuskokwim River rainbow smelt.

**JROD Flaws Regarding Kuskokwim River Rainbow Smelt**

70.　　The JROD acknowledges that there would be impacts to Kuskokwim River rainbow smelt.　Nevertheless the JROD concludes that there would be no significant degradation to the Kuskokwim River.　To find no significant degradation to the Kuskokwim River, the JROD relies on a rainbow smelt monitoring program, Donlin's proposed barge communication plan, and subsistence and barging subcommittees to be established under the Donlin Advisory Technical Review Committee (DATROC). Members of the subcommittees would comprise community volunteers.　DATROC is made up of representatives of Donlin, Calista, and TKC.

71.　　Neither the monitoring program, the communication plan, nor the DATROC subcommittees require adoption of any measures to reduce impacts to Kuskokwim River rainbow smelt.　They require monitoring, assessments, and

*Orutsararmiut Native Council et al. v. U.S. Army Corps of Eng'rs et al.,*
Case No. 3:23-cv-00071-HRH　　　　　　　　　　　　　　　　　　　　　21

communication, but not actual mitigation.

72.    Donlin's rainbow smelt monitoring plan requires collection of baseline data for Kuskokwim River rainbow smelt like age structure, sex ratio, and possibly fecundity of females.  If changes are observed, Donlin's plan requires additional monitoring to determine the cause of the changes.  If population changes could be attributed to Donlin-project-related activities, Donlin would then do an "assessment" of possible measures to address or mitigate those activities.

73.    Donlin's proposed barge communication plan involves notifying communities about oncoming barges and meeting with communities about barging impacts.

74.    There is no legal requirement that Donlin create subsistence and barging subcommittees.  At most, the subcommittees can make a recommendation to the DATROC.

### COUNT I

**(National Environmental Policy Act—
Failure to Assess Foreseeable Impacts of Tailings Dam Failure)**

75.    NEPA requires that federal agencies prepare an environmental impact statement (EIS) for major federal actions that could significantly affect the quality of the human environment.  42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508.11 (2018).[1]

---

[1] All citations to NEPA regulations reference those in place at the time the Corps published the final EIS in 2018.

76.     NEPA requires that an EIS analyze and discuss the direct, indirect, and cumulative impacts of agencies' actions along with alternatives to the proposed action. 40 C.F.R. §§ 1502.16, 1508.7, 1508.8.

77.     NEPA requires that an EIS examine significant adverse environmental effects that are "reasonably foreseeable." *Id.* §§ 1502.22, 1508.8(b), 1508.7. The term "reasonably foreseeable" includes impacts that have "catastrophic consequences" even if their probability of occurrence is low, "provided that the analysis of the impacts is supported by credible scientific evidence, is not based on pure conjecture, and is within the rule of reason." *Id.* § 1502.22(b).

78.     A tailings spill of more than 0.5 percent of the tailings dam capacity is reasonably foreseeable. A tailings spill of between 20 to 40 percent of the tailings dam capacity is reasonably foreseeable. Such a catastrophic spill would have a significant adverse impact on the environment.

79.     The FEIS does not examine a catastrophic tailings spill or provide information about its impacts. The FEIS instead analyzes a partial spill of only 0.5 percent of the tailings capacity. The spill size of 0.5 percent was chosen with no technical basis.

80.     By failing to assess the reasonably foreseeable risk of a catastrophic spill, the FEIS violates NEPA. 40 C.F.R. §§ 1502.16, 1502.22. The FEIS fails to provide sufficient information to decisionmakers or the public to inform the choice of alternatives

and mitigation.  The FEIS and the resulting JROD, Corps permit, and right-of-way authorization are arbitrary, capricious, and not in accordance with the law, and were adopted without observance of procedure required by law.  5 U.S.C. § 706.

## COUNT II

### (Alaska National Interest Lands Conservation Act— Failure to Assess Foreseeable Impacts of Tailings Dam Failure)

81.     In ANILCA, Congress made a specific finding that the "continuation of the opportunity for subsistence uses . . . is essential to Native physical, economic, traditional, and cultural existence."  16 U.S.C. § 3111(1).  Congress also found that "the situation in Alaska is unique in that, in most cases, no practical alternative means are available to replace the food supplies and other items gathered from fish and wildlife which supply rural residents dependent on subsistence uses."  *Id*. § 3111(2).

82.     ANILCA section 810 requires that before allowing the use of federal lands, federal land management agencies first evaluate the impacts to subsistence uses and needs, consider alternatives, and then determine whether the action may cause a significant restriction to subsistence uses.  *Id*. § 3120(a).

83.     If there may be a significant restriction to subsistence, then the agency must give notice and hold hearings in the vicinity of communities that could be impacted and make certain findings.  *Id*.

84.     A tailings spill of more than 0.5 percent of the tailings capacity is reasonably foreseeable.  A tailings spill of between 20 to 40 percent of the tailings

capacity is reasonably foreseeable. Such a catastrophic spill would have a significant adverse impact on subsistence uses. Such a spill would significantly restrict subsistence uses.

85.     BLM's ANILCA section 810 analysis did not look at the subsistence impacts of a catastrophic tailings spill. Like the FEIS, BLM's ANILCA section 810 subsistence analysis considered a spill of 0.5 percent of the total tailings capacity.

86.     By failing to assess the reasonably foreseeable risk of a catastrophic tailings spill, BLM's ANILCA section 810 analysis violates ANILCA. *Id.* BLM's ANILCA section 810 analysis provides insufficient information for required hearings and consultation with tribes and provides an insufficient basis for an analysis of alternatives and minimizing adverse impacts. BLM's ANILCA section 810 analysis and the resulting JROD and right-of-way authorization are arbitrary, capricious, and contrary to law and were adopted without observance of procedure required by law. 5 U.S.C. § 706.

## COUNT III

**(National Environmental Policy Act—
Failure to Disclose Responsible Opposing Views on Health Impacts)**

87.     NEPA requires that an agency evaluate and consider significant adverse effects of its action on the human environment. 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1502.16. The "human environment" includes the relationship of people with the environment. 40 C.F.R. § 1508.14.

88.     NEPA requires that an EIS contain a "full and fair" discussion of a

project's adverse environmental impacts. *Id.* § 1502.1. NEPA requires that the agency in the DEIS make "every effort" to disclose and discuss major points of view about the environmental impacts of action alternatives being considered. *Id*. § 1502.9(a).

89. NEPA requires that in the FEIS, the agency disclose and respond to "any responsible opposing view" not adequately discussed in the DEIS. *Id.* § 1502.9(b).

90. DHSS's analysis and findings of the human health impacts of the Donlin project in the 2016 HIA constitute a responsible opposing view. The FEIS presents substantially more positive views of health impacts than those presented in the 2016 HIA. The FEIS does not disclose or respond to the more serious concerns of the 2016 HIA.

91. By failing to provide a full and fair discussion of the potential human health impacts from the Donlin project, and by failing to disclose or respond to the responsible opposing views presented in the 2016 HIA, the FEIS violates NEPA. *Id.*; *id.* §§ 1502.16, 1502.1. The FEIS provides an insufficient basis for the Corps' human health determinations, public interest findings, and environmental justice determinations. The FEIS also provides an insufficient basis for the Corps' consideration of and determinations regarding alternatives and mitigation. The FEIS and the resulting JROD, Corps permit, and right-of-way authorization are arbitrary, capricious, and contrary to law, and were adopted without observance of procedure required by law. 5 U.S.C. § 706.

## COUNT IV

### (Clean Water Act—Significant Degradation of Aquatic Resources)

Case 3:23-cv-00071-JMK   Document 1   Filed 04/05/23   Page 27 of 29

92.     The Clean Water Act prohibits issuance of a section 404 permit for discharge of dredged or fill material if it would cause or contribute to significant degradation of aquatic resources.  40 C.F.R. § 230.10(c).

93.     The Clean Water Act requires that a finding of significant degradation be based on factual findings about the project's effects, including secondary effects.  *Id*.; *id.* § 230.11.

94.     The FEIS and JROD predict negative impacts to Kuskokwim River rainbow smelt from Donlin barges' propeller wash, including potential population-level effects.  These predicted impacts constitute significant degradation of the Kuskokwim River.

95.     The finding in the JROD of no significant degradation under the Clean Water Act section 404 relies on procedural factors.  It relies on monitoring, assessments, and communication with no required action to prevent significant degradation.

96.     For these reasons, the JROD and the resulting Corps permit violate Clean Water Act section 404.  *Id*. § 230.10(c).  They are arbitrary, capricious, and contrary to law.  5 U.S.C. § 706.

## PRAYER FOR RELIEF

Plaintiffs respectfully request the Court:

1.     Declare the FEIS, JROD, Corps permit, and right-of-way authorization unlawful;

Case 3:23-cv-00071-JMK   Document 1   Filed 04/05/23   Page 28 of 29

2.    Set aside and vacate the FEIS, JROD, Corps permit, and right-of-way authorization;

3.    Grant preliminary and permanent injunctive relief as needed;

4.    Award Plaintiffs their reasonable costs, fees, and expenses, including attorneys' fees, under 28 U.S.C. § 2412; and

5.    Grant such further relief the Court deems necessary and proper.

Respectfully submitted this 5th day of April, 2023.

*s/ Maile Tavepholjalern*
Maile Tavepholjalern
EARTHJUSTICE
441 W 5th Avenue Suite 301
Anchorage, AK 99501
T: 907.277.2500
E: mtave@earthjustice.org

*s/ Hannah M. Payne*
Hannah M. Payne
EARTHJUSTICE
441 W 5th Avenue Suite 301
Anchorage, AK 99501
T: 907.277.2500
E: hpayne@earthjustice.org

*Attorneys for Plaintiffs Orutsararmiut Native Council; Tuluksak Native Community; and Organized Village of Kwethluk.*