Maile Tavepholjalern
Hannah Payne Foster
Ian S. Dooley
EARTHJUSTICE
441 W 5th Avenue Suite 301
Anchorage, AK 99501
T: 907.277.2500
E: mtave@earthjustice.org
E: hfoster@earthjustice.org
E: idooley@earthjustice.org

*Attorneys for Plaintiffs Orutsararmiut Native Council, Tuluksak Native Community, Organized Village of Kwethluk, Native Village of Eek, Native Village of Kwigillingok, and Chevak Native Village.*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| ORUTSARARMIUT NATIVE COUNCIL *et al.*, | ) |
| | ) Case No. 3:23-cv-00071-SLG |
| *Plaintiffs*, | ) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES ARMY CORPS OF ENGINEERS *et al.*, | ) |
| | ) |
| *Defendants* | ) |
| | ) |
| and | ) |
| | ) |
| DONLIN GOLD LLC, CALISTA CORPORATION, and STATE OF ALASKA, | ) |
| | ) |
| *Intervenor-Defendants*. | ) |
| | ) |

**PLAINTIFFS' REPLY BRIEF UNDER LOCAL RULE 16.3**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................. 1

I.     The final EIS violates NEPA because it applies the wrong legal standard and excludes much larger tailings spills that are reasonably foreseeable. ............... 1

     A.    Defendants applied the wrong legal standard. ............................................ 2

     B.    A 1/1000 chance annually of a much larger tailings spill is reasonably foreseeable. ................................................................. 6

II.    The failure to analyze a larger tailings spill also violates ANILCA. ..................... 13

III.   The failure to disclose and discuss the state HIA violates NEPA.......................... 14

     A.    The state HIA is a responsible opposing viewpoint.................................. 14

     B.    Defendants failed to disclose and address the state HIA's findings and recommendations................................................................. 19

     C.    The final EIS's discussion of human health impacts is misleading. ........... 22

IV.   The Corps violated the Clean Water Act by relying on ineffective measures to prevent significant degradation. ........................................................... 23

     A.    The Corps arbitrarily relied on ineffective measures to support its finding of no significant degradation. ......................................................... 24

     B.    Defendants and Intervenors misrepresent the Corps' conclusions regarding Kuskokwim River rainbow smelt. ............................................... 27

          1.    The Corps concluded that smelt-specific measures are necessary to avoid significant degradation. ..................................... 27

          2.    Defendants and Intervenors erroneously attempt to minimize the risk of harm to Kuskokwim River rainbow smelt. ..................... 28

     C.    Donlin's Barging is a Secondary Effect Under the Clean Water Act. ........ 32

V.    Vacatur is the appropriate remedy....................................................... 34

CONCLUSION ................................................................................................. 38

*Orutsararmiut Native Council et al. v. U.S. Army Corps of Eng'rs et al.,*
Case No. 3:23-cv-00071-SLG          i

CERTIFICATE OF COMPLIANCE WITH WORD LIMITS ........................................... 39

# TABLE OF AUTHORITIES

## CASES

*All. for the Wild Rockies v. U.S. Forest Serv.*,
  907 F.3d 1105 (9th Cir. 2018) ............................................................................... 34

*Amerada Hess Pipeline Corp. v. FERC*,
  117 F.3d 596 (D.C. Cir. 1997) ............................................................................... 34

*Auer v. Robbins*,
  519 U.S. 452 (1997) ............................................................................................... 34

*Cal. Cmtys. Against Toxics v. U.S. Env't Prot. Agency*,
  688 F.3d 989 (9th Cir.2012) ............................................................................ 34, 37

*Citizens Against Toxic Sprays, Inc. v. Bergland*,
  428 F.Supp. 908 (D. Or. 1977) .............................................................................. 17

*Ctr. for Biological Diversity v. U.S. Forest Serv.*,
  349 F.3d 1157 (9th Cir. 2003) ..................................................................... 15, 17, 20

*Ctr. for Env't Health v. Vilsack*,
  No. 15-cv-01690-JSC, 2016 WL 3383954 (N.D. Cal. June 20, 2016) ...................... 35

*Earth Island Inst. v. U.S. Forest Serv.*,
  442 F.3d 1147 (9th Cir. 2006) ......................................................................... 20, 21

*Env't Health Tr. v. Fed. Commc'ns Comm'n*,
  9 F.4th 893 (D.C. Cir. 2021) .................................................................................. 12

*Food & Water Watch v. FERC*,
  28 F.4th 277 (D.C. Cir. 2022) .................................................................................. 6

*Fox Bay Partners v. U.S. Corps of Eng'rs*,
  831 F.Supp. 605 (N.D. Ill. 1993) ...................................................................... 33, 34

*Friends of the Earth v. Hall*,
  693 F.Supp. 904 (W.D. Wash. 1988) ............................................... 15, 16, 17, 27, 35

*Ground Zero Ctr. for Non-Violent Action v. U.S. Dep't of Navy*,
  383 F.3d 1082 (9th Cir. 2004) ............................................................................... 2, 6

*Orutsararmiut Native Council et al. v. U.S. Army Corps of Eng'rs et al.,*
Case No. 3:23-cv-00071-SLG                                                                                    iii

*Humane Soc'y v. Locke*,
626 F.3d 1040 (9th Cir. 2010) ................................................................... 37

*Idaho Farm Bureau Fed'n v. Babbitt*,
58 F.3d 1392 (9th Cir. 1995) ..................................................................... 34

*Limerick Ecology Action, Inc. v. U.S. Nuclear Regul. Comm'n*,
869 F.2d 719 (3d Cir. 1989) ..................................................................... 3, 8

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ...................................................................................... 28

*New York v. Nuclear Regul. Comm'n*,
681 F.3d 471 (D.C. Cir. 2012) ................................................................. 3, 8

*Nw. Env't Advocs. v. U.S. Env't Prot. Agency*,
No. 3:12-cv-01751-AC, 2018 WL 6524161 (D. Or. Dec. 12, 2018).......................... 35

*Pac. Coast Fed'n of Fishermen's Ass'ns v. Nat'l Marine Fisheries Servs.*,
482 F.Supp. 2d 1248 (W.D. Wash. 2007)................................................... 17

*Pollinator Stewardship Council v. U.S. Env't Prot. Agency*,
806 F.3d 520 (9th Cir. 2015) ............................................................... 34, 37

*Pub. Emps. for Envtl. Responsibility v. U.S. Fish & Wildlife Serv.*,
189 F.Supp.3d 1 (D.D.C. 2016) ................................................................. 36

*San Luis Obispo Mothers for Peace v. Nuclear Regul. Comm'n*,
449 F.3d 1016 (9th Cir. 2006) ................................................. 3, 4, 5, 7, 8, 11

*San Luis Obispo Mothers for Peace v. Nuclear Regul. Comm'n*,
635 F.3d 1109 (9th Cir. 2011) ..................................................................... 8

*Se. Alaska Conservation Council v. U.S. Forest Serv.*,
443 F.Supp.3d 995 (D. Alaska 2020) ........................................................ 37

*Seattle Audubon Soc. v. Espy*,
998 F.2d 699 (9th Cir. 1993) ......................................................... 15, 16, 17

*Skidmore v. Swift & Co.*,
323 U.S. 134 (1944)..................................................................................... 34

*Solar Energy Indus. Ass'n v. FERC*,
80 F.4th 956 (9th Cir. 2023) ......................................................................... 6

*Orutsararmiut Native Council et al. v. U.S. Army Corps of Eng'rs et al.,*
Case No. 3:23-cv-00071-SLG iv

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs,*
    282 F.Supp.3d 91 (D.D.C. 2017) ........................................................................ 36

*Stewart v. Potts,*
    996 F.Supp. 668 (S.D. Tex. 1998) ................................................................... 33

*W. Oil and Gas Ass'n v. U.S. Env't Prot. Agency,*
    633 F.2d 803 (9th Cir. 1980) ........................................................................... 37

*W. Watersheds Project v. U.S. Sheep Experiment Station,*
    No. 1:19-CV-00065-REB, 2021 WL 1517977 (D. Idaho Apr. 16, 2021) ........ 23

*Warm Springs Dam Task Force v. Gribble,*
    621 F.2d 1017 (9th Cir. 1980) ......................................................................... 12

## STATUTES

33 U.S.C. § 1344(a) ............................................................................................. 34

33 U.S.C. § 1344(b) ............................................................................................. 34

33 U.S.C. § 1344(d) ............................................................................................. 34

42 U.S.C. § 4332(C)(ii) .................................................................................. 2, 4, 7

## REGULATIONS

40 C.F.R. § 230.10(c) (2018) .............................................................................. 24

40 C.F.R. § 230.11(h) (2018) ......................................................................... 32, 33

40 C.F.R. § 1502.9(b) (2018) ................................................................... 14, 15, 20

40 C.F.R. § 1502.22(b)(1) (2018) ......................................................................... 5

40 C.F.R. § 1508.1(aa) (2023) .............................................................................. 5

## FEDERAL REGISTER NOTICES

51 Fed. Reg. 15,618 (Apr. 25, 1986) .................................................................... 5

# COURT RULES

L.Civ.R.16.3(c) ...................................................................................................... 37

*Orutsararmiut Native Council et al. v. U.S. Army Corps of Eng'rs et al.,*
Case No. 3:23-cv-00071-SLG                                                                          vi

**INTRODUCTION**

Defendants and Intervenors argue, contrary to federal law, that agencies did not need to consider certain aspects of the Donlin mine at all. These include the risk of a very large tailings spill and the need to protect a key subsistence species. They also argue, contrary to law, that agencies did not need to disclose and discuss the state health impact assessment (HIA), which reflects greater and more likely harm to human health than do federal analyses. Alternatively, they urge, contrary to the record, that they examined these risks or that the risks are far less than what the final environmental impact statement (EIS) or the state HIA predicts. They also fail to show that ineffective adaptive management would avert potential population-level impacts to rainbow smelt on the Kuskokwim River.

As shown below, neither the law nor the record supports disregarding these risks. The Court should enter judgment in Plaintiff Tribes' favor and vacate the joint record of decision (JROD) and Defendants' authorizations.

I. **The final EIS violates NEPA because it applies the wrong legal standard and excludes much larger tailings spills that are reasonably foreseeable.**

Contrary to arguments by Defendants, Donlin, and the state, Defendants applied the wrong legal standard of "reasonable likelihood" rather than the "reasonably foreseeable" standard that the National Environmental Policy Act (NEPA) requires. Doc. 59 at 33; AR_0012887. Applying that standard, Defendants examined a relatively small spill of 0.5 percent of the tailings dam volume. Doc. 59 at 13-14. They declined to look

*Orutsararmiut Native Council et al. v. U.S. Army Corps of Eng'rs et al.,*
Case No. 3:23-cv-00071-SLG                                                          1

at much larger spills, like all identified catastrophic spills for the Donlin mine with a 1/1000 annual chance of occurring. AR_0012887. A 1/1000 annual chance of a much larger spill (around 2 percent over 20 years), however, is reasonably foreseeable and should have been considered. Doc. 59 at 30-33.

Defendants and Donlin now rely on caselaw from disparate contexts and a misreading of NEPA to rewrite the requirement that agencies analyze the reasonably foreseeable environmental consequences of their actions. They assert that the probability of a larger spill like a catastrophic spill is much smaller than estimated in the final EIS. They also assert that Defendants appropriately relied on a workshop hosted by a Donlin contractor to identify numerous possible modes of tailings failures and, in doing so, considered larger, catastrophic spills. These arguments are unsupported by the record and the law.

### A. Defendants applied the wrong legal standard.

The undisputed legal standard is that Defendants need to consider the reasonably foreseeable environmental effects of their actions. Doc. 61 at 20-21; Doc. 70 at 18-22; Doc. 75 at 18-19; Doc. 74 at 30; Doc. 59 at 27-29; *accord* 42 U.S.C. § 4332(C)(ii) (EIS must include "any reasonably foreseeable adverse environmental effects which cannot be avoided should the proposal be implemented"). When applying this standard, agencies need not look at items that are remote or speculative. *Ground Zero Ctr. for Non-Violent Action v. U.S. Dep't of Navy*, 383 F.3d 1082, 1089-90 (9th Cir. 2004). But where environmental consequences are not remote or speculative, agencies must consider them

*Orutsararmiut Native Council et al. v. U.S. Army Corps of Eng'rs et al.,*
Case No. 3:23-cv-00071-SLG 2

under NEPA, even if they are unlikely. *San Luis Obispo Mothers for Peace v. Nuclear Regul. Comm'n* (*Mothers for Peace I*), 449 F.3d 1016, 1029-31 (9th Cir. 2006).

Contrary to Defendants' arguments, Doc. 61 at 29-30 & n.4, courts including the Ninth Circuit have viewed a variety of low-probability, high-consequence events as reasonably foreseeable. For example, the Ninth Circuit has required that agencies consider the possibility of a post-9/11 terrorist attack. *Id.* The Third Circuit has required an agency to consider design alternatives for severe accidents in light of the possibility of a nuclear meltdown. *Limerick Ecology Action, Inc. v. U.S. Nuclear Regul. Comm'n*, 869 F.2d 719, 741 (3d Cir. 1989) (finding persuasive the argument that after the Three-Mile Island disaster "it would be irrational for the [Nuclear Regulatory Commission] to maintain that severe accident risks are too remote to require consideration"). In the context of failing to find a permanent storage site for spent nuclear fuel, the D.C. Circuit reasoned that "reasonable assurance" that permanent storage would be available did not describe a "probability of failure so low as to dismiss the potential consequences of such a failure." *New York v. Nuclear Regul. Comm'n*, 681 F.3d 471, 478–79 (D.C. Cir. 2012).

Defendants, Donlin, and the state suggest Defendants applied NEPA's reasonably foreseeable standard. Doc. 61 at 20-24; Doc. 70 at 16-22; Doc. 75 at 18-19. This is incorrect. Instead, Defendants applied a different standard: a tailings spill with a 1/1000 annual chance is a worst-case scenario that must be excluded under NEPA. AR_0012887. Under this standard, Defendants defined worst-case scenarios as having a 1/1000 annual chance of occurring. *Id.*; AR_0026685-87 (focusing on tailings spill

*Orutsararmiut Native Council et al. v. U.S. Army Corps of Eng'rs et al.,*
Case No. 3:23-cv-00071-SLG                                                                 3

scenarios with likelihood greater than 1/1000 annually). Defendants then interpreted NEPA to prohibit consideration of "worst case" scenarios. AR_0012887 (citing federal contractor's memo). Defendants accordingly focused on scenarios with a higher probability of occurrence such as 1/200 annually or 1/40 annually.

| Likelihood | Frequency Descriptor 1 | Frequency Descriptor 2 | Probability of occurrence over twenty years | Probability of occurrence in any one year |
|---|---|---|---|---|
| Almost Certain | Happens often | High frequency (more than once every 5 years) | 98% | 17.8% |
| Likely | Could easily happen | Event does occur, has a history, once every 15 years | 75% | 6.7% |
| Possible | Could happen and has happened elsewhere | Occurs once every 40 years | 40% | 2.5% |
| Unlikely | Hasn't happened yet but could | Occurs once every 200 years | 10% | 0.5% |
| Very Unlikely | Conceivable, but only in extreme circumstances | Occurs once every 1000 years | < 2% | 0.1% |

AR_0026685-86. Defendants termed this standard "reasonable likelihood." AR_0012887. The words "reasonably foreseeable" appear nowhere in Defendants' spill analyses in the final EIS. AR_0012858-3077. Applying this standard, Defendants failed to consider much larger tailings spills, like all identified catastrophic spills for the Donlin mine. AR_0012887.

While Defendants, Donlin, and the state urge otherwise, application of Defendants' standard is contrary to law because it applies a different legal standard from that NEPA requires. Doc. 61 at 24-26; Doc. 70 at 17, 20-22; Doc. 75 at 18-19. If a worst case scenario is reasonably foreseeable, Defendants must consider it. 42 U.S.C. § 4332(C)(ii); *Mothers for Peace I*, 449 F.3d at 1028; Doc. 59 at 33-34. Tribes do not

*Orutsararmiut Native Council et al. v. U.S. Army Corps of Eng'rs et al.,*
Case No. 3:23-cv-00071-SLG 4

request a "worst case" analysis, however. They ask only that Defendants consider the "range of environmental impacts" likely to result from a reasonably foreseeable tailings spill. *Mothers for Peace I*, 449 F.3d at 1034. Further, while former NEPA regulations required analysis of "worst case" scenarios, the regulation was modified to remove the worst-case requirement and to be more clear. 51 Fed. Reg. 15,618, 15,619-21 (Apr. 25, 1986). The regulations provide in relevant part: "'reasonably foreseeable' includes impacts which have catastrophic consequences, even if their probability of occurrence is low, provided that the analysis of the impacts is supported by credible scientific evidence, is not based on pure conjecture, and is within the rule of reason." 40 C.F.R. § 1502.22(b)(1) (2018); *accord* 40 C.F.R. § 1508.1(aa) (2023) (linking "reasonably foreseeable" with what a person of "ordinary prudence" would take into account).

Defendants' standard that 1/1000 annual probability is a "worst case" scenario is also simply wrong. Some "best case" tailings spill scenarios, like spill scenarios of insignificant volume, can also have a 1/1000 annual chance of occurring. This is in addition to the three catastrophic spills identified for Donlin with a 1/1000 annual chance of occurring. AR_0012887. Thus, excluding all scenarios with a 1/1000 annual chance of occurrence as being "worst case" makes no sense.

Defendants and Donlin now veer from the caselaw to justify Defendants' application of a "reasonable likelihood" standard. Doc. 61 at 24-25, 28; Doc. 70 at 21-23. As Tribes earlier explained, "reasonable likelihood" is not equivalent to NEPA's standard of "reasonable foreseeability." Doc. 59 at 33; *accord* Doc. 61 at 28 (suggesting

"reasonable likelihood" means probable). Neither of Donlin's cited cases demonstrates otherwise. Instead, they conflate references to "likelihood" with references to "foreseeability" in vastly different contexts. *Solar Energy Indus. Ass'n v. FERC*, 80 F.4th 956, 989, 995 (9th Cir. 2023) (referencing likelihood in relation to standing while ruling that environmental impacts were reasonably foreseeable under 2023 NEPA regulation); *Food & Water Watch v. FERC*, 28 F.4th 277, 285, 292 (D.C. Cir. 2022) (mentioning likelihood in context of redressability while examining foreseeability of downstream gas emissions). Neither does "reasonably likely" mean "probable," as Defendants and Donlin have urged. Doc. 61 at 24-25, 28; Doc. 70 at 21-23. This construction would not even require that Defendants examine the "unlikely" spill of 0.5 percent of the tailings volume they did analyze. If this interpretation were correct, it would nullify the otherwise undisputed requirement that an EIS must consider low probability, high consequence events.

    **B.    A 1/1000 chance annually of a much larger tailings spill is reasonably foreseeable.**

Where the probability of an impact is "infinitesimal" like one in 100 million or one in a trillion, the Ninth Circuit has ruled this to be "remote and speculative." *Ground Zero*, 383 F.3d at 1090. Accordingly, NEPA did not require consideration of the environmental consequences of the impact. *Id*. Of course, where an impact is not remote or speculative and instead is reasonably foreseeable, NEPA requires agencies consider its environmental consequences. *Supra* at 2-3.

Contrary to arguments by Defendants, Donlin, and the state, Doc. 61 at 29-30; Doc. 70 at 18-20; Doc. 75, at 18-19, a 1/1000 annual chance of a much larger tailings spill is reasonably foreseeable. Doc. 59 at 30-33. Defendants identified "several" ways in which the Donlin tailings dam could catastrophically fail. AR_0012887. The record shows that when tailings dams catastrophically fail, they release 20-40 percent of their contents. Doc. 59 at 31. Defendants assigned a probability of 1/1000 annually or around 2 percent over 20 years to these catastrophic failure scenarios and, on that basis, excluded them from analysis. AR_0012886-87; AR_0026684-85 (retaining no scenarios with 1/1000 annual probability of failure); AR_0026686-87. Given the mine's 27-year active life, the probability of a catastrophic failure over the mine's life is likely even greater than 2 percent.[1] Additionally, a catastrophic tailings failure happened at a mine in British Columbia during the environmental analysis process for the Donlin mine. Doc. 59 at 15. The 1/1000 annual probability of a catastrophic tailings dam failure for the Donlin mine is accordingly reasonably foreseeable and should have been considered by Defendants. 42 U.S.C. § 4332(C)(ii); *Mothers for Peace I*, 449 F.3d at 1028. Defendants' failure to do so was arbitrary and violated NEPA.

Both *Mothers for Peace* decisions reinforce that NEPA requires Defendants to consider the impacts of a larger tailings spill, contrary to Defendants' arguments, Doc. 61

---

[1] Assuming independent, linear probabilities, the final EIS's 1/1000 probability equates to a 2 percent probability over 20 years. $20*1/1000 = 0.02$. Under this assumption, the probability of a larger spill such as a catastrophic spill during the mine's 27-year active life ($27*1/1000 = 0.027$) would be even greater than 2 percent.

*Orutsararmiut Native Council et al. v. U.S. Army Corps of Eng'rs et al.,*
Case No. 3:23-cv-00071-SLG                                                                 7

at 29-30.  In *Mothers for Peace I*, the agency declined to look at the consequences of a post-9/11 terrorist attack.  449 F.3d at 1028.  The environmental assessment under challenge was "not devoid" of mention of terrorist attacks, but the agency had failed to consider terrorist attacks for the purposes of its environmental review.  *Id.* at 1024.  The Ninth Circuit specifically rejected the agency's contention that the "possibility" of a terrorist attack was too remote and speculative to avoid consideration under NEPA.  *Id.* Similarly, Defendants here excluded from consideration all tailings spills—including all identified catastrophic spills—with a probability of 1/1,000 per year or around 2 percent over 20 years.  *Supra* at 3-4, 7.  *Mothers for Peace II* further reinforces NEPA's requirement that an agency must look at the reasonably foreseeable consequences of its actions.  *San Luis Obispo Mothers for Peace v. Nuclear Regul. Comm'n* (*Mothers for Peace II*), 635 F.3d 1109, 1112-13 (9th Cir. 2011).  There, the Ninth Circuit finally affirmed the agency's decision *after* agency staff on remand looked at the most severe plausible threat of a terrorist attack.  *Id.* at 1120-21.

Defendants' characterization of other low probability, high-consequence cases further underscore their similarities to this case.  Doc. 61 at 30 n.4.  In both *New York* and *Limerick*, the agency—like Defendants here—did not find the environmental impacts of a risk to be remote and speculative.  Both courts then ruled that the agency's failure to consider those impacts would be inconsistent with the law.  *New York*, 681 F.3d at 479; *Limerick*, 869 F.2d at 741.

Rather than considering a much larger failure, such as a catastrophic failure,

Defendants looked at a tailings spill of 2.6 million cubic yards, 0.5 percent of the tailings dam capacity.  Doc. 59 at 15.  As earlier discussed, Defendants applied a reasonable likelihood standard to rule out all spills with a 1/1000 annual chance of occurrence, including all catastrophic spills.  *Supra* at 3-4.  Defendants then deemed these spills to be "worst case" and excluded them all from analysis.  AR_0012887; AR_0026685.  Of the remaining spill scenarios that had been identified, Defendants focused on and ultimately selected two spill scenarios, each generating a 2.6 million cubic yard spill, just 0.5 percent of the tailings volume.  AR_0012886-87.  While the final EIS acknowledges the selected spill volume covered "lesser" spill volumes, the selected spill volume did not encompass much larger spills such as catastrophic spills.  AR_0012887 (excluding all identified catastrophic spills).

Nevertheless, Defendants and Donlin contend that Defendants considered a much larger spill.  Doc. 61 at 22-23 ; Doc. 70 at 17.  The Failure Modes and Effects Analysis (FMEA) workshop, however, led by a Donlin contractor, focused principally on identifying as many ways as possible the Donlin tailings dam could fail, including several ways the dam could fail catastrophically.  AR_0132913-15.  Defendants and Intervenors identify nowhere in the record where Defendants considered a larger tailings spill.

Defendants and Donlin make several belated efforts to shrink the final EIS's estimate of a 1/1000 annual probability of a much larger failure for the Donlin mine.  Doc. 61 at 23, 26; Doc. 70 at 19-20, 25-26.  These efforts are unsupported by the record.

Contrary to Donlin's suggestion, Doc. 70 at 24-25, the final EIS estimate of a

1/1000 chance annually for "several" modes of catastrophic failure is not general, but rather is specific to the Donlin mine.  AR_0012887.

The design features relied upon by Defendants and Donlin to further decrease the probability of failure are already taken into account in the final EIS's impact analysis. AR_0013070; AR_0020187-88.  They cannot invoke them again; doing so would be double counting.  Additionally, any reliance on Donlin reducing free water storage in the tailings facility or on future unidentified design modifications is similarly unpersuasive. *E.g.*, Doc. 61 at 23, 26.  The record does not quantify any further reduction in spill probability.  *E.g.*, AR_0012887.  Nor does the record indicate how those changes would affect what tailings spill volumes are reasonably foreseeable.  *Id.*

Donlin's attempt to read the "less than 2 percent clause" as something much smaller than 2 percent is inconsistent with the record.  Doc. 70 at 19-20.  As explained earlier, a 1/1000 annual probability, assuming linear independent probabilities, equates to two percent over 20 years.  *Supra* at 7 n.1.  Further, Defendants' rationale for introducing the prefatory clause "less than" is unexplained in the record.  *See, e.g.*, AR_0012886 (very unlikely events have a 1/1000 annual probability); AR_0026692 (instruction to FMEA workshop participants on likelihood did not include "less than").  Given the record evidence, a "less than" two percent probability over 20 years is a concrete possibility.  Additionally, a less than two percent probability of a catastrophic tailings spill over 20 years is reasonably foreseeable.  *Supra* at 6-8.

Defendants and Donlin's attempt to distinguish the catastrophic tailings spill at the

Mount Polley mine in British Columbia also falls short.  Doc. 61 at 26; Doc. 70 at 25-26.

The Mount Polley tailings spill demonstrates that large tailings spills can happen and

have happened.  Doc. 59 at 14-15.  While mines have numerous differences, the record

shows that tailings spills, including catastrophic spills of 20 percent or more of the

tailings dam volume, can occur and have occurred, including for tailings dams

constructed using the downstream method.  *Id*.; *see* CPM_0008070 (describing Los

Frailes tailings dam failure); AR_0339026 (more than 45 percent of tailings dam volume

released for Los Frailes).  Also, the reversal in position of Donlin and a federal

contractor—prompted by the catastrophic tailings spill at Mount Polley—from

considering no tailings spill at all to considering a small one, indicates that a large tailings

spill is a serious risk not to be disregarded.  Doc. 59 at 14-15; *see also Mothers for Peace*

*I*, 449 F.3d at 1031.  Donlin also incorrectly suggests that it adopted best available

technology (BAT) methods from the Mount Polley Independent Review Panel.  Doc. 70

at 25-26.  While Donlin plans to drain free water from tailings at closure, AR_0012888

(referencing no ponded water), it does not adopt the two principal BAT methods: dry

stack tailings or burying tailings.  CPM_0015796; AR_0338525 (aboveground tailings);

AR_0012888 (dry stack alternative would have "lower risk" of tailings release than

chosen alternative).

Defendants, Donlin, and the state also make several other arguments that are

immaterial.  They highlight the expertise of FMEA workshop participants and state

regulatory oversight.  Doc. 61 at 21-24; Doc. 70 at 18-23, 25 n.9; Doc. 75 at 18.  But

references to agencies' or others' technical expertise do not make an arbitrary decision reasonable. *See Env't Health Tr. v. Fed. Commc'ns Comm'n*, 9 F.4th 893, 905–06 (D.C. Cir. 2021) (reliance on another agency's conclusory statements was arbitrary and capricious); *cf.* AR_0074319 (Donlin would be the largest-ever Corps-led permitting project in the country). Future oversight by a different regulatory body applying different standards does not negate Defendants' obligation to comply with NEPA. That the state also intends to examine a total dam failure before issuing a dam safety certificate also suggests that a much larger tailings failure is reasonably foreseeable and information about its impacts are important for decisionmakers and the public. AR_0013636.

As noted by Donlin's contractor, the chosen spill volume "had no technical basis." AR_0114477. Donlin notes this statement means that chosen spill size was simply representative of a "significant" spill. Doc. 70 at 23. But this neither supplies the missing technical basis nor the much larger spill volume that is reasonably foreseeable. Further, the FMEA workshop identified "several" ways for Donlin's tailings dam to catastrophically fail. AR_0012887. Defendants, however, point to nowhere in the record where they considered the consequences of these failure scenarios.

Contrary to Defendants' contention, neither does *Warm Springs* rule out that a catastrophic tailings dam failure could be a reasonably foreseeable event. Doc. 61 at 24-25 (citing *Warm Springs Dam Task Force v. Gribble*, 621 F.2d 1017, 1026-27 (9th Cir. 1980)). The decision, issued prior to decades of caselaw clarifying NEPA's requirements, concerned a water reservoir dam—a dam type with a significantly lower

failure rate than tailings dams.  *E.g.*, AR_0014856.

Defendants cite a statement apparently from a federal contractor's memo to argue that it is not industry or NEPA practice to analyze a 20 percent spill.  Doc. 61 at 27 (citing AR_0013636-37); AR_0057884.  For this proposition, Defendants appear to rely on the federal contractor's statement unsupported by legal authority.  AR_0057884. Regardless, as Tribes earlier explained, these contentions are irrelevant to whether Defendants have complied with NEPA's requirement to analyze the reasonably foreseeable effects of their actions.  Doc. 59 at 34.

## II.     The failure to analyze a larger tailings spill also violates ANILCA.

Just as the final EIS violates NEPA, it violates section 810 of the Alaska National Interest Lands Conservation Act (ANILCA).  As Tribes explained in their opening brief, BLM's evaluation of the mine's reasonably foreseeable impacts to subsistence must be at least as rigorous as NEPA's requirements to analyze reasonably foreseeable environmental impacts.  Doc. 59 at 30.  Defendants, Donlin, and the state do not dispute this.  Doc. 61 at 31-33; Doc. 70 at 27; Doc. 75 at 19-21.  Instead, Defendants argue that they complied with ANILCA's Tier 2 notice and hearing requirements.  Doc. 61 at 33-35. These arguments are beside the point.  Tribes challenge only Defendants' compliance with section 810's Tier 1 requirements—separate requirements for subsistence evaluations at the outset.  Doc. 59 at 29-30; *see also* AR_0016209 (analyzing same spill scenarios as in final EIS).

**III.    The failure to disclose and discuss the state HIA violates NEPA.**

Defendants and Intervenors confuse a central point: state and federal agencies each attempted to do the same thing—conduct a health impact assessment that provided recommendations for action and monitoring to decisionmakers.  Doc. 59 at 16-18.  The state HIA, however, reflected greater and more likely harm to health from the Donlin mine, but those conclusions were never disclosed in the final EIS.  *Id.* at 18-21.  Defendants, Donlin, and the state then deny that the state HIA is a responsible opposing viewpoint that needed to be addressed.  Doc. 61 at 39; Doc. 70 at 29-30; Doc. 75 at 23-24.  The state HIA, however, contains both a direct challenge to the final EIS (regarding subsistence and food security) and across-the-board differences, including with the final EIS providing lower and less likely ratings for harm.  *Infra* at 15-17.  While there is no dispute that the state HIA and final EIS's conclusions are different, Defendants, Donlin, and the state attempt unsuccessfully to mask or minimize those differences and fail to meaningfully distinguish applicable law.  Doc. 61 at 40; Doc. 70 at 31-32; Doc. 75 at 25.

**A.  The state HIA is a responsible opposing viewpoint.**

When not discussed in the draft EIS, NEPA requires that agencies disclose and discuss responsible opposing viewpoints in the body of the final EIS.  40 C.F.R. § 1502.9(b) (2018).  Defendants, Donlin, and the state do not dispute this basic principle.  Doc. 61 at 38; Doc. 70 at 28-29; Doc. 75 at 23.

Instead, Defendants, Donlin, and the state incorrectly assert that the state HIA is not a responsible opposing viewpoint because it does not directly challenge or conflict

*Orutsararmiut Native Council et al. v. U.S. Army Corps of Eng'rs et al.,*
Case No. 3:23-cv-00071-SLG                                                                                  14

with the scientific basis of the EIS.  Doc. 61 at 39; Doc. 70 at 29-30; Doc. 75 at 23.

NEPA however, requires that an EIS disclose and discuss responsible opposing opinions,

including those that constitute a difference in degree.  40 C.F.R. §1502.9(b) (2018);

*Seattle Audubon Soc. v. Espy*, 998 F.2d 699, 703-04 (9th Cir. 1993) (rate of decline for

spotted owl was faster and more substantial than anticipated).  Where a scientific view

arose in direct conflict with a conclusion of the EIS, courts have of course found

responsible opposing viewpoints.  *E.g.*, *Ctr. for Biological Diversity v. U.S. Forest Serv.*

*(CBD)*, 349 F.3d 1157, 1160 (9th Cir. 2003).  So too have courts found a responsible

opposing view when differences comprised a difference in degree.  *E.g., Espy*, 998 F.2d

at 703-04; *Friends of the Earth v. Hall*, 693 F.Supp. 904, 933-34 (W.D. Wash. 1988)

(minor versus lethal effects of fill).  Here, both situations exist: the final EIS both

systematically differs from and, in at least one instance, directly contradicts the findings

of the state HIA.

The final EIS directly contradicts the state HIA's findings on food security and

subsistence impacts.  The state HIA rates this category as strongly negative, with an

impact level of 7 and just as likely to occur as not.  Doc. 59 at 20.  The final EIS also

analyzes this impact, as noted by the state, Doc. 75 at 25, but rates it as largely *positive*.

Doc. 59 at 20.  The positive component (food security) is rated as strongly positive

(impact level 7-8) and very likely to occur.  *Id*.  The negative component (subsistence

impacts) is rated as moderately negative (impact level 3-4) and unlikely to occur.  *Id*.  In

a region like the Yukon-Kuskokwim Delta, where food security and subsistence are

*Orutsararmiut Native Council et al. v. U.S. Army Corps of Eng'rs et al.,*
Case No. 3:23-cv-00071-SLG                                                                15

related, paramount concerns, this is a critical category. *Id.* at 10-12. The final EIS did not disclose or discuss this directly contradictory viewpoint. AR_0021075-80.

For the remaining health impact categories, the state HIA presents significant differences in the degree and likelihood of harm from those in the final EIS, and those differences are no less significant. *Espy*, 998 F.2d at 703-04; *Hall*, 693 F.Supp. at 933-34. The final EIS assigns lower or less likely negative ratings than does the state HIA. For five negative impacts the state HIA identifies, the final EIS provides a lower impact level. Doc. 59 at 19. For all 13 negative impacts in the state HIA, the final EIS rates them as less likely to occur. *Id*. For 11 of the 13 negative impacts in the state HIA, the final EIS rates them as having a lower Category. *Id*. Notably, the final EIS includes no Category 3 ratings for negative impacts, which would trigger a recommendation for action by decisionmakers, while the state HIA contains four. *Id.* at 18-19.

Conversely, the final EIS assigns higher or more likely positive ratings than does the state HIA. *Id.* at 21. For all five positive impacts the state HIA identifies, the final EIS rates them as having a higher impact level. *Id*. For three of the five positive impacts, the final EIS rates them as more likely to occur. *Id*. For three of the five positive impacts, the final EIS provides a higher Category rating. *Id*. While the final EIS finds better health outcomes across the board, there are no impact categories where the final EIS finds worse outcomes.

These variations constitute across-the-board differences from the views of the state public health authority on the mine's potential health impacts and what, if any, action

steps and monitoring should be considered by decisionmakers.  The final EIS did not disclose or discuss these views.  Doc. 59 at 16-21.

Defendants' failure to disclose and discuss these responsible opposing views in the final EIS was arbitrary and violated NEPA.  *See CBD*, 349 F.3d at 1167-68; *Espy*, 998 F.2d at 703-04; *see also Hall*, 693 F.Supp. at 934 ("Where scientists disagree about possible adverse environmental effect, the EIS must inform decision-makers of 'the full range of responsible opinion on the environmental effects[.]'") (quoting *Citizens Against Toxic Sprays, Inc. v. Bergland*, 428 F.Supp. 908, 922 (D. Or. 1977), *supplemented*, (D. Or. Apr. 18, 1978)); *accord Pac. Coast Fed'n of Fishermen's Ass'ns v. Nat'l Marine Fisheries Servs.*, 482 F.Supp. 2d 1248, 1255 (W.D. Wash. 2007).  This carried not insubstantial implications.  The public could not have known that Defendants disagreed with state public health experts about the effect, magnitude, and likelihood of the mine's potential impacts.  Nor would they have known that Defendants disagreed with state public health experts on the strength and substance of recommendations that decisionmakers take action or conduct monitoring.

Contrary to Defendants' suggestion, these differences are not simply a matter of priority.  Doc. 61 at 39.  The Category rating, for example, concerns the substance and strength of a recommendation that a decisionmaker take action or conduct monitoring. Doc. 59 at 18; AR_0084551-54; AR_0021041.  As Donlin and the state acknowledge, the Category rating itself prioritizes matters of substance—namely, recommendations that the decisionmaker take action or conduct monitoring.  Doc. 70 at 29-30; Doc. 75 at 23.

Further, the Category rating comprises specific, substantive components, including the effect, magnitude, and likelihood of a health impact. Doc. 59 at 17-18. Whether a health impact is positive or negative determines whether a recommendation for action is merited at all. Doc. 59 at 18. As described above and in Tribes' opening brief, these differences have substantive implications. *Supra* at 15-18; Doc. 59 at 40-41. Had the final EIS disclosed the conclusions of the state HIA, decisionmakers may have reached different conclusions about the mine's overall health impacts, whether the mine was in the public interest, or raised environmental justice issues, including with respect to subsistence. Disclosure and discussion of the state HIA's conclusions would certainly have enhanced public understanding. *Id.*

That the state supports the Donlin project as a whole does not negate the views of state public health experts that the mine's potential negative impacts are more likely, more severe, or trigger more or different recommendations for action or monitoring, than assessed by federal agencies. Doc. 70 at 30; Doc. 75 at 7-8. State public health officials might not have expressed ongoing concerns about how the final EIS addressed the state HIA. They did, however, raise concerns that a critical part of the draft EIS's health analysis was one-sided. AR_0017667 ("This entire section [3.22.4.2.4 (food, nutrition, subsistence activity)] needs to present both sides of the picture. There are potential negative impacts to food security, costs, and consumption."). Further, the state maintains the continued validity of the state HIA. Doc. 75 at 23.

### B. Defendants failed to disclose and address the state HIA's findings and recommendations.

Defendants and Intervenors confuse a core issue: the final EIS and the state HIA purport to do the same thing—conduct a health impact assessment that makes findings and provides recommendations to federal decisionmakers.  Doc. 59 at 17-18; AR_0020998 (chapter 3.22 of the final EIS "consistent with" state HIA methodology); AR_0084362, 72-74 (referencing "[g]eneral parameters developed by the 'Alaska Technical Guidance for Health Impact Assessment'").  The two documents each contain background information on the mine's potential health impacts but reach significantly different conclusions and findings.  AR_0084377-489, AR_0021006-32; Doc. 59 at 16-21, 37-38.  Whether the final EIS relied in some way on the state HIA as a "primary source" is irrelevant to Tribes' claim.  Defendants, Donlin, and the state identify nowhere in the record where the final EIS discusses and discloses the state HIA's findings and recommendations.  Defendants' ambiguous responses in an appendix, indicating that the final EIS's assessment was re-evaluated or clarified in response to comments referencing the state HIA, do not disclose much of anything.  AR_0013694-98.

Defendants do not dispute that the final EIS selectively cites the state HIA.  Instead, Defendants, Donlin, and the state's record citations confirm that the final EIS cites the state HIA only for background information and generally as a "primary source." *E.g.*, Doc. 61 at 40-42; Doc. 70 at 28; Doc. 75 at 24; *see also, e.g.*, AR_0021004; AR_0021082. The final EIS contains no discussion of the state HIA's findings and

*Orutsararmiut Native Council et al. v. U.S. Army Corps of Eng'rs et al.,*
Case No. 3:23-cv-00071-SLG                                                    19

recommendations.

Disclosing general comments about potential public health impacts, AR_0013694-98, fails to satisfy NEPA.  As Tribes earlier explained, Doc. 59 at 36-37, and Defendants and Intervenors do not contest, NEPA requires that an EIS respond "explicitly and directly to conflicting views." *Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147, 1172-73 (9th Cir. 2006), *abrogated on other grounds by Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008).  Defendants incorrectly reference general comments about potential health impacts and seemingly comments of the Environmental Protection Agency (EPA)—a cooperating agency—to suggest that the *public* had an opportunity to provide comments on the findings and recommendations of the state HIA and therefore was not harmed.  Doc. 61 at 42; *see* AR_0059113 (expressing concerns that state HIA may be inconsistent with draft EIS and recommending the state HIA be publicly reviewed).  Even if it had been true, this is irrelevant.  Regardless of whether the public had access to the state HIA, NEPA requires the final EIS itself disclose and discuss responsible opposing views.  40 C.F.R. § 1502.9(b) (2018); *CBD*, 349 F.3d at 1167.

Defendants' suggestion that the draft EIS disclosed an earlier version of the state HIA's findings is no excuse for noncompliance with NEPA's terms.  The draft EIS incorporates the same flaws as the final EIS, albeit with reference to an earlier version of the state HIA.  *E.g.*, AR_0092201, 09 (citing Newfields, Draft Health Impact Assessment – Version 1, Donlin Gold Project (Dec. 31, 2014) (Newfields 2015)).  Additionally, the earlier version of the state HIA did not include the state's recommendations for action

*Orutsararmiut Native Council et al. v. U.S. Army Corps of Eng'rs et al.*,
Case No. 3:23-cv-00071-SLG                                                                          20

steps or monitoring.  AR_0138943.

Defendants, Donlin, and the state make several other arguments of no consequence.  That Defendants and Donlin believe Defendants' human health analysis is well-reasoned is beside the point.  Doc. 61 at 36-38; Doc. 70 at 28.  It does not excuse the obligation to disclose responsible opposing views.

Nor does the deliberative process privilege excuse NEPA compliance.  While the state claimed the deliberative process at one time, it clearly no longer does.  *E.g.*, Doc. 75 at 22-26.  The record demonstrates that any deliberation ended before publication of the final EIS.  *See* AR_0058224 ("We understand that ADHSS does not plan to make revisions to the HIA.").  Moreover, it is undisputed that Defendants already discussed some aspects of the state HIA in the final EIS—but the law requires they discuss the state HIA in a way that complies with NEPA, regardless of the applicability of any privilege.  *Supra* at 14-15, 17.  Likewise, contrary to Defendants' suggestion, Doc. 61 at 42 n.7, a FOIA request is not a pre-requisite for NEPA compliance.

Defendants and Intervenors' arguments that the state HIA is a draft is similarly unavailing.  Doc. 61 at 41; Doc. 70 at 28.  A final EIS "cannot assume that simply because the . . . studies are preliminary, the adverse impacts discussed therein will not occur."  *Earth Island Inst.*, 442 F.3d at 1172.  "Rather, the FEIS[] must respond explicitly and directly to conflicting views in order to satisfy NEPA's procedural requirements."  *Id.*

**C.     The final EIS's discussion of human health impacts is misleading.**

Beyond violating NEPA's disclosure and discussion requirement, the final EIS is misleading.  There is no dispute that once an agency opts to do an analysis, the analysis cannot be misleading.  Doc. 59 at 40-41; Doc. 61 at 42-43; Doc. 70 at 33 n.13.

Here, the final EIS's selective references to the state HIA suggest that the state HIA and the final EIS are consistent with each other when they are not.  Doc. 59 at 41.  The language cited by Defendants and Donlin underscores how the final EIS is misleading in this regard.  Doc. 61 at 38, 40-42; Doc. 70 at 28.  The final EIS mentions that it was conducted "consistent" with state guidance on health impact assessments and that the state HIA was incorporated as a "source document."  Doc. 59 at 41.  The final EIS frequently references sources "as cited in [the state HIA]."  *Id*.  There is no dispute, however, that the final EIS failed to disclose that its conclusions differed from those in the state HIA.  As explained in Tribes' opening brief, absent disclosure that the two analyses reached significantly different conclusions, these references suggest that the two documents are, at minimum, consonant.  *Id.*

Donlin incorrectly suggests that these references are not misleading because the final EIS expressly relies on other sources of information or processes.  Doc. 70 at 33.  That the final EIS included some different information or studies is of no moment.  Its selective references to the state HIA suggest that the two analyses reach similar conclusions.  Donlin's suggestion that the state HIA was not consistent with the state's own guidance, is unsupported by the record.  Doc. 70 at 33.  Instead, the record shows

*Orutsararmiut Native Council et al. v. U.S. Army Corps of Eng'rs et al.,*
Case No. 3:23-cv-00071-SLG                                                                22

that the state HIA and the final EIS were conducted pursuant to state guidance but reached different results. *Supra* at 14-18. The record contradicts the state's argument that the final EIS is not misleading because the HIA has only a limited function, Doc. 75 at 22-26. The record instead supports the HIA's substantive functions and the fact that the state HIA and final EIS purport to accomplish the same thing. *Supra* at 14-18.

Defendants and Donlin unsuccessfully attempt to distinguish cases where courts found agency discussions were misleading. Doc. 61 at 42-43; Doc. 70 at 33 n.13. The factual grounds that Defendants and Donlin point to—that an agency admits an error, or the size of the agency's error—is irrelevant to whether the agency in fact complied with NEPA. Donlin's attempt to recast *Sheep Experiment Station* as a case about incomplete baseline data is itself misleading. There, the court held the agency did not sufficiently examine impacts to sheep and grizzly bears, finding in part the agency's portrayal of grizzly bear/sheep encounters as minimal—without disclosing that no sheep were present in that area—was misleading. *W. Watersheds Project v. U.S. Sheep Experiment Station*, No. 1:19-CV-00065-REB, 2021 WL 1517977, at *14-15 (D. Idaho Apr. 16, 2021).

## IV. The Corps violated the Clean Water Act by relying on ineffective measures to prevent significant degradation.

Tribes challenge as arbitrary the Corps' decision in the JROD to rely on three ineffective measures specific to rainbow smelt to prevent significant degradation. Defendants and Intervenors sow confusion around Tribes' claim by referencing irrelevant materials, including already-accounted-for design features, in the final EIS. Defendants,

Intervenors, and the Native Village of Crooked Creek then try without success to show that the three measures—communication, subcommittees, and monitoring—would effectively prevent predicted harm to Kuskokwim River rainbow smelt.

### A. The Corps arbitrarily relied on ineffective measures to support its finding of no significant degradation.

As discussed in Tribes' opening brief, the Corps cannot issue a Clean Water Act section 404 permit that would cause or contribute to significant degradation. 40 C.F.R. § 230.10(c) (2018). Defendants do not dispute that in order to rely on adaptive management, the measures relied upon must be effective and enforceable. Doc. 59 at 45-46. Precisely because barging impacts to Kuskokwim River rainbow smelt could occur at different times and locations, identifying and implementing effective adaptive management is crucial. Defendants, Intervenors, and Crooked Creek point to nowhere in the record, however, showing the Corps' proposed adaptive management would be effective at reducing potential population-level impacts to Kuskokwim River rainbow smelt. Doc. 61 at 49-50; Doc. 70 at 42-43; Doc. 74 at 26; Doc. 75 at 26-27; Doc. 66-1 at 17-18.

Defendants and Intervenors unhelpfully confuse Tribes' claim. The Corps finds in the JROD that "the primary measures to avoid significant degradation of the Kuskokwim River are" three smelt-specific measures: monitoring, subcommittees, and communication. AR_0001024. Tribes challenge the Corps' ultimate conclusion that "with implementation of the rainbow smelt monitoring program, the communication

program, and the subcommittees under [Donlin Advisory Technical Review Oversight Committee (DATROC)], there would be no significant degradation of Kuskokwim River [waters of the United States (WOUS)]." *Id.* Specifically, Tribes argue that the Corps' relying on those measures—which are ineffective at preventing harm—to avoid a finding of significant degradation was arbitrary. Doc. 59 at 41-46. Defendants and Intervenors, however, incorrectly suggest that Tribes take issue with the findings in the final EIS instead of the Corps' conclusion in the JROD. As shown below, those points are irrelevant.

Defendants and Intervenors first try to blur the issue by pointing the Court to other design features—besides the three "adaptive management" measures on which the Corps specifically relied for its decision. Doc. 61 at 47-49; Doc. 70 at 36-42; Doc. 74 at 25-26; Doc. 75 at 27. These other design features include barge guidelines, navigational aids, and river surveys. Defendants and Intervenors suggest that these design features would prevent population-level impacts to Kuskokwim River rainbow smelt. This is incorrect. All design features were already accounted for in the impacts analysis and ultimately in the Corps' decision to specifically require three smelt-specific mitigation measures as the "primary measures" to prevent significant degradation. AR_0022484; AR_0020187-88; AR_0001024; *see also* AR_0022450 (predicting potential "population-level" impacts to rainbow smelt); AR_0022482 (Tbl.3.13-26) (potential population level effects for eggs, larvae, and juvenile fish going downriver).

Defendants, Donlin, Calista, and Crooked Creek then argue that adaptive

management measures on which Defendants specifically relied to find no significant degradation—communications between barges and subsistence users, subcommittees, and a rainbow smelt monitoring program, AR_0001024—would be effective. Doc. 61 at 49-50; Doc. 70 at 42-43; Doc. 74 at 26-27; Doc. 66-1 at 17-18. Fundamentally, these "adaptive management" measures are not effective at preventing impacts to Kuskokwim River rainbow smelt. Defendants, Donlin, Calista, and Crooked Creek do not show otherwise.

As explained in Tribes' opening brief, the proposed barge communication plan and the DATROC are not relevant to reducing impacts to Kuskokwim River rainbow smelt. Doc. 59 at 43-45. The main function of a pilot boat Donlin references, part of the barge communication plan, is to warn subsistence users about incoming barges and inform tug captains about subsistence uses. AR_0013315-16. The Corps also misconstrues EPA's letter praising DATROC's establishment. EPA's letter supports the creation of DATROC specifically due to the committees' focus on communication with subsistence users—an effect irrelevant to reducing projected barge impacts to rainbow smelt. AR_0008953.

Further, Donlin's rainbow smelt monitoring program would not ensure predicted harm to rainbow smelt is avoided. The Corps, Donlin, and Calista reiterate that Donlin would collect information about rainbow smelt through monitoring. Doc. 61 at 48-49; Doc. 70 at 42; Doc. 74 at 26-27. But, as Tribes earlier explained, baseline data collection is not a requirement for remedial action. Doc. 59 at 44.

Donlin and Calista try to distance themselves from applicable law—to no avail. Donlin reaches for cases from other jurisdictions to suggest that monitoring would be sufficient. Doc. 70 at 44. But those cases are contrary to the weight of Ninth Circuit caselaw regarding adaptive management. Doc. 59 at 45-46. Calista also attempts to distinguish relevant adaptive management caselaw as NEPA or Endangered Species Act (ESA) cases. Doc. 74 at 27-28. To the contrary, given its substantive purpose to protect the nation's waters, effective adaptive management is as or more important in the Clean Water Act context than in the ESA or NEPA contexts. Calista's attempt to distinguish *Hall* as a case that turned on an error that stemmed from the EIS rather than the agency's record of decision is similarly unpersuasive. Doc. 74 at 28.

Ultimately, the Corps fails to show that its selected adaptive management measures would remedy potential harm to Kuskokwim River rainbow smelt. The Corps' reliance on its three listed "adaptive management" measures to avoid a significant degradation finding is therefore arbitrary.

**B.    Defendants and Intervenors misrepresent the Corps' conclusions regarding Kuskokwim River rainbow smelt.**

**1.  The Corps concluded that smelt-specific measures are necessary to avoid significant degradation.**

As explained above, the Corps concluded that three smelt-specific measures were needed to avoid significant degradation. In the JROD, the Corps concluded that the smelt monitoring program, barge communication plan, and advisory subcommittees specifically were "*[t]he primary measures* to be implemented *to avoid significant degradation* of the

Kuskokwim River." AR_0001024 (emphasis added). As later described, Donlin's barges could cause population-level harm to Kuskokwim River rainbow smelt. *Infra* at 29-31; *see also* AR_0022450; AR_0022482 (Tbl.3.13-26) (for category "Propeller-induced fish injury and mortality," finding "Fish eggs, larvae, and small young-of-year juvenile life stages moving downstream may experience population-level effects").

Puzzlingly, Defendants and Intervenors claim that the Corps did not find that Kuskokwim River rainbow smelt are at risk of population-level impacts, and that the no-significant-degradation finding did not rely on the three ineffective mitigation measures. *E.g.*, Doc. 61 at 46-48; *see also* Doc. 70 at 40-41; Doc. 74 at 24; Doc. 75 at 27. This is an impermissible attempt to rewrite the agency's conclusions. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 50 (1983) ("courts may not accept appellate counsel's *post hoc* rationalizations for agency action") (citation omitted). To support these new conclusions, Defendants and Intervenors pick through the record to downplay the risk of harm to Kuskokwim River rainbow smelt.

### 2. Defendants and Intervenors erroneously attempt to minimize the risk of harm to Kuskokwim River rainbow smelt.

Defendants and Intervenors selectively cite the record to argue that Donlin barges "likely would not significantly impact rainbow smelt." Doc. 61 at 45; *see also* Doc. 70 at 40-41; Doc. 74 at 24; Doc. 75 at 27. This ignores the record and the conclusion that the Corps ultimately reached: that that smelt-specific mitigation measures are needed to avoid significant degradation from Donlin's barges.

In one of the two years that Kuskokwim River rainbow smelt were sampled and studied during the EIS process, Donlin's barges—more powerful than and up to four times as large as current barges, Doc. 59 at 12—likely would not have been able to avoid impacts to rainbow smelt. AR_0022450. Those impacts could have been population level. *Id.*; *see also* AR_0022482 (Tbl.3.13-26) (potential population-level impacts to eggs, larvae, and juvenile fish going downriver).

To try to diminish those impacts, Defendants and Intervenors describe barge design features. Doc. 61 at 45-46; Doc. 70 at 38-40; Doc. 74 at 24-27; Doc. 75 at 27. They are irrelevant. As explained earlier, despite considering design features, the Corps concluded three smelt-specific mitigation measures were needed. Defendants and Intervenors cannot count the design features again. *Supra* at 25. And critically, no feature would enable Donlin's barges to avoid harming smelt larvae, which are highly vulnerable to entrainment as they float downriver on the water's surface. Doc. 59 at 23-24; AR_0022482 (Tbl.3.13-26) (finding larvae at risk of "population-level effects").

Defendants and Intervenors further suggest that the barges would operate and smelt would spawn in such a way as to minimize impacts to smelt. *E.g.*, Doc. 61 at 45-46; Doc. 70 at 38-40; Doc. 74 at 24-27; Doc. 75 at 27. But Defendants and Intervenors' arguments depend on an over-idealized picture of barge operations. They make assumptions that are contradicted by the record, like barges would generally stay in the deepest or average depth of the river and can maintain sufficient under-keel clearance to avoid an acute risk of scour. *E.g.*, Doc. 61 at 45-46; Doc. 70 at 41. This ignores that

*Orutsararmiut Native Council et al. v. U.S. Army Corps of Eng'rs et al.,*
Case No. 3:23-cv-00071-SLG                                                                                           29

barges could still have an under-keel clearance of two feet or less and that scour depth for stationary tugs increases substantially. Doc. 59 at 23; AR_0022452 (Fig.3.13-5 n.1); *see also* AR_0018027 ("In shallow water or areas where high power to the propellers is needed (e.g., maneuvering around a bend, or staging tows in shallow areas), the magnitude of the impact is expected to increase . . . ."). Donlin also suggests smelt will spawn in a way to minimize barge impacts to themselves. Doc. 70 at 39. This is contradicted by the record and obscures the risk to smelt. The area where smelt spawn in a given year could occur anywhere over the nearly 90-mile length between Tuluksak and Aniak. AR_0022367; AR_0075416; *see also* AR_0115255 (smelt harvest as far upriver as Aniak); AR_0276791, 93 (Tuluksak around river mile 136; Aniak around river mile 225). This includes three critical sections (including one in which barges would need to decouple to traverse), as well as various sections—given up to three Donlin barges on the river at any time, Doc. 24 at 13, ¶36; Doc. 34 at 11, ¶36—where two barges might pass simultaneously. AR_0017947-48; AR_0018019-20 (need for 1x1 tow at Nelson Island at certain water depths); AR_0011198. Depending on where smelt spawn in a given year, Donlin's barges may not be able to avoid running over smelt eggs. A deeper navigable channel may simply not exist at that time or juncture. *See* AR_0022450; AR_0011198-99; *see also* AR_0115265 (Kuskokwim River water depth can drop by five feet between rainbow smelt spawning and hatching).

Defendants and Intervenors misinterpret a generalized reference to fish populations and try to apply it to Kuskokwim River rainbow smelt. Doc. 61 at 44; Doc.

70 at 40; Doc. 74 at 22 (all citing AR_0022459). The "normal variation" statement applies to "fish" generally. AR_0022459. It does not negate the final EIS's findings about Kuskokwim River rainbow smelt. Fish populations as a whole can remain within normal variation while Kuskokwim River rainbow smelt experience "population-level" impacts. AR_0022450. To the extent the statement does include smelt, it is unclear whether it applies to rainbow smelt as an entire population (which extends far beyond the Kuskokwim, *see* AR_0022367) or the specific subset of the population that spawns in the Kuskokwim River. Even if the "normal variation" statement could be applied to Kuskokwim River rainbow smelt, it is contradicted by the specific record evidence detailing the severe risk of harm to smelt. AR_0022450. It is also contradicted by the final EIS's conclusions that "Fish eggs, larvae, and small young-of-year juvenile life stages moving downstream may experience population-level effects." *E.g.*, AR_0022482 (Tbl.3.13-26). The severity of these predicted impacts is underscored by the final EIS's structure. Three of the six action alternatives—none of which were adopted—contemplate reducing the number of barges or barging distance with a proportionate decrease in impacts to Kuskokwim River rainbow smelt. AR_0022328; AR_0016392.

Finally, Defendants imply—without legal support—that to be successful, Tribes must show that "barging activities *will* cause significant degradation." Doc. 61 at 46. Donlin also quibbles with the meaning of "significant." Doc. 70 at 41 n.17. These arguments are immaterial. The Corps believed that harm was sufficiently likely to require three mitigation measures specific to Kuskokwim River rainbow smelt.

AR_0001024.  Tribes, therefore, need only show that reliance on these measures was arbitrary.  !

Here, the Corps concluded that smelt-specific measures are necessary to avoid significant degradation.  It then erred in concluding that the smelt monitoring program, barge communication plan, and advisory subcommittees—ineffective and irrelevant measures—would prevent significant degradation.  *See* AR_0001024; AR_0022482 (Tbl.3.13-26) (noting potential population impacts to fish eggs, larvae, and downriver-bound juveniles).

### C.      Donlin's Barging is a Secondary Effect Under the Clean Water Act.

Defendants and Intervenors do not dispute that the Clean Water Act 404(b)(1) Guidelines prohibit a discharge of fill material if it would cause or contribute to significant degradation.  Doc. 61 at 47-48; Doc. 70 at 34-35; Doc 74 at 20; Doc. 75 at 28. Defendants, Calista, and Donlin also do not dispute that the Guidelines require a significant degradation determination be based on factual findings, including findings of "secondary effects."  Doc. 61 at 13; *see* Doc. 70 at 35 n.15; Doc. 74 at 21.  As relevant here, "secondary effects" are those associated with, though not directly resulting from, the discharge of fill.  40 C.F.R. § 230.11(h) (2018).

The Corps appropriately considered Donlin's barging as a secondary effect in its significant degradation analysis.  The Corps does not dispute this.  *See* Doc. 61 at 17 (describing discharge of fill for barge landing in Kuskokwim River).  Nevertheless, Intervenors maintain that Donlin's barging is too far removed from the fill being

*Orutsararmiut Native Council et al. v. U.S. Army Corps of Eng'rs et al.,*
Case No. 3:23-cv-00071-SLG                                                                                      32

permitted to merit consideration.  Doc. 70 at 34-36; Doc. 74 at 21; *see* Doc. 75 at 27-29.

Donlin proposed and the Corps permitted 21,774 cubic yards of fill placement into the

Kuskokwim River to build a new port for the mine.  AR_0000505.  The

Angyaruaq/Jungjuk Port's purpose is precisely to receive Donlin's barges and to load and

offload cargo, diesel, cyanide, mercury, and other materials.  Doc. 59 at 12;

AR_0016397.  Supplies would then be transported via a 30-mile road to the mine site.

AR_0016397.  Absent the Angyaruaq/Jungjuk Port, the entire barge transportation

corridor and Donlin's mine access road would each lack a terminus.  AR_0016386

(Fig.1).  After the mine's active life, the Angyaruaq/Jungjuk Port would then be

decommissioned.  AR_0020063.  Additionally, as no roads lead into the region,

numerous mine features are closely related to barging and interdependent on it, e.g., to

bring the fuel and machinery to excavate, fill, and dewater jurisdictional wetlands.  *E.g.*,

AR_0016397; Doc. 24 at 11, ¶27; Doc. 35 at 8, ¶27; AR_0072870 (noting "it is not

technically or economically feasible to transport cargo to the mine site without barges").

The Corps thus properly considered Donlin's barging as a secondary effect under

the Clean Water Act.  40 C.F.R. § 230.11(h) (2018); *Fox Bay Partners v. U.S. Corps of

Eng'rs*, 831 F.Supp. 605, 609-10 (N.D. Ill. 1993) (upholding Corps' denial of section 404

fill permit to construct new boat slips where harm would include oversaturated boating

conditions and adverse impacts to river); *Stewart v. Potts*, 996 F.Supp. 668, 683 (S.D.

Tex. 1998) ("tasks necessary to accomplish [the project] are so interrelated and

functionally interdependent as to bring the entire project within the jurisdiction of the

Corps"). Intervenors' contrary arguments reflect a misunderstanding of the record and Donlin's planned mine operations.[2]

## V.      Vacatur is the appropriate remedy.

Defendants and Intervenors have failed to overcome the presumption of vacatur. *See All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1121 (9th Cir. 2018). Remand without vacatur is appropriate only in "limited circumstances." *Cal. Cmtys. Against Toxics v. U.S. Env't Prot. Agency*, 688 F.3d 989, 994 (9th Cir.2012). To determine whether to leave a rule in place, courts "weigh the seriousness of the agency's errors against the 'disruptive consequences of'" vacatur. *Pollinator Stewardship Council v. U.S. Env't Prot. Agency*, 806 F.3d 520, 532 (9th Cir. 2015) (quoting *Cal. Cmtys. Against Toxics*, 688 F.3d at 992). Courts also consider whether leaving a rule in place risks environmental harm. *Id.* An invalid rule is left in place "only 'when equity demands.'" *Id.* (quoting *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995)). Defendants and Intervenors have failed to meet the burden to overcome the

---

[2] Should this Court find the regulation language ambiguous, the Corps' decision to examine barging impacts merits deference under both *Auer* and *Skidmore*. *Auer v. Robbins*, 519 U.S. 452, 461 (1997); *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944); *see Amerada Hess Pipeline Corp. v. FERC*, 117 F.3d 596, 600-01 (D.C. Cir. 1997) (recognizing *Auer* deference can apply where Congress charges one agency with implementing another's regulations). First, while EPA promulgates the 404(b)(1) Guidelines in consultation with the Corps, Congress delegated to the Corps the responsibility to issue Clean Water Act section 404 permits that comply with the Guidelines. 33 U.S.C. § 1344(a)-(b), (d). Second, the Corps' interpretation is consistent with the regulation's text, the project's requirements, and the agency's prior interpretations of the regulation, *e.g., Fox Bay*, 831 F. Supp. at 609-10.

presumption of vacatur.  *See Nw. Env't Advocs. v. U.S. Env't Prot. Agency*, No. 3:12-cv-01751-AC, 2018 WL 6524161, at *3 (D. Or. Dec. 12, 2018) ("[agency]" bears the burden of demonstrating vacatur is inappropriate); *Ctr. for Env't Health v. Vilsack*, No. 15-cv-01690-JSC, 2016 WL 3383954, at *13 (N.D. Cal. June 20, 2016) ("[G]iven that vacatur is the presumptive remedy for a procedural violation such as this, it is Defendants' burden to show that vacatur is unwarranted.").

Defendants and Intervenors make no real argument that Defendants' errors in this case are not serious.  Doc. 61 at 42-43; Doc. 70 at 45-46; Doc. 75 at 29; Doc. 74 at 30-31.  Nor could they.  The errors include failing to properly assess a catastrophic tailings dam failure that could pollute the entire region for generations, Doc. 59 at 27-35, and potential population level effects on a key subsistence species from the massive increase in barging activity, Doc. 59 at 41-46.  Compounding these errors is Defendants' failure to disclose and respond to information showing the potentially severe human health consequences of their decision.  Doc. 59 at 35-41.  The violations alleged here are serious and could lead to substantially different outcomes on remand.  Doc. 59 at 47; *see also Hall*, 693 F.Supp. at 946 (setting aside finding of no significant degradation).  Further, these errors are not ones Defendants can simply explain away.  Tribes' claims require new environmental and subsistence analyses,[3] meaningful public input to decisionmakers, and effective

---

[3] Undersigned counsel was unaware of the 2023 resolution referenced by Calista.  Doc. 74 at 17-18.  It is of no moment, given that Tribes here challenge the adequacy of Defendants' environmental and subsistence analyses.

*Orutsararmiut Native Council et al. v. U.S. Army Corps of Eng'rs et al.*,
Case No. 3:23-cv-00071-SLG                                                                                          35

measures to prevent harm to Kuskokwim River rainbow smelt.

As to the potential disruptive consequences of vacatur, Intervenors suggest that potential delay in mine construction and unrealized economic expectations warrant remand without vacatur.  Doc. 70 at 46; Doc. 75 at 29.  To the contrary, vacatur at this juncture makes sense, when construction of the mine has yet to begin, before equipment and personnel are deployed, and before permanent environmental harm ensues.  Doc. 59 at 47.  Donlin's self-inflicted delay, despite federal permits being issued almost six years ago, casts doubt on Donlin and the state's unsupported assertions that further delay to conduct proper analyses and decisionmaking would affect the viability of the project or that vacatur would unduly affect available economic opportunities.  Doc. 59 at 13 (Defendants' authorizations granted August 13, 2018); AR_0270221 (project "particularly sensitive" to gold price); Doc. 70 at 46; Doc. 75 at 29-30.  Tribes are federally recognized tribal governments in the Yukon-Kuskokwim region and view the risks of the mine as greatly outweighing any potential economic benefit.[4]  In any event, some risk of economic disruption is a normal consequence of vacatur.  *See, e.g.*, *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 282 F.Supp.3d 91, 104 (D.D.C. 2017) (reasoning in part that "lost profits and industrial inconvenience" are "the nature of doing business, especially in an area fraught with bureaucracy and litigation"); *Pub. Emps. for Envtl. Responsibility v. U.S. Fish & Wildlife Serv.,* 189 F.Supp.3d 1, 3 (D.D.C. 2016)

---

[4] The state incorrectly asserts that Tribes are Calista shareholders.  Doc. 75 at 9.

*Orutsararmiut Native Council et al. v. U.S. Army Corps of Eng'rs et al.,*
Case No. 3:23-cv-00071-SLG                                                                                     36

("Absent a strong showing by [the agency] that vacatur will unduly harm economic interests. . ., the Court is reluctant to rely on economic disruption" to deny vacatur).

Unlike cases cited by Donlin and the state, Doc. 70 at 45-46, Doc. 75 at 29, this is not a "limited" or "rare" circumstance in which equity demands remand without vacatur. *Pollinator Stewardship Council*, 806 F.3d at 532; *Humane Soc'y v. Locke*, 626 F.3d 1040, 1053 n.7 (9th Cir. 2010). In those cases, vacatur could have "wiped out" a snail species or "thwarted 'the operation of the Clean Air Act in'" California. *Cal. Cmtys. Against Toxics*, 688 F.3d at 992 (quoting *W. Oil and Gas Ass'n v. U.S. Env't Prot. Agency*, 633 F.2d 803, 813 (9th Cir. 1980)). In this instance, leaving the agencies' decisions in place "risks more potential harm than vacating" them. *See Pollinator Stewardship Council*, 806 F.3d at 532; *e.g.*, AR_0016206 (Donlin's barging during construction and operation may cause significant restrictions in access to and availability of subsistence resources for 15 villages along the Kuskokwim River).

Lastly, despite the seriousness of the agency's errors here, Defendants assert, with no citation to authority and contrary to local rules and practice, that relief is premature and should be addressed in supplemental briefing. Doc. 61 at 51-52. This assertion is without support; in fact, local rules establish a comprehensive briefing schedule that does not include bifurcated proceedings. L.Civ.R.16.3(c). Defendants stipulated to the briefing schedule without seeking bifurcation, Doc. 46, and that schedule was ordered by this Court, Doc. 47. This is not an unusual case involving a complex question of remedy where bifurcation has been found to be appropriate. *See, e.g., Se. Alaska Conservation*

*Council v. U.S. Forest Serv.*, 443 F.Supp.3d 995, 1022-23 (D. Alaska 2020) (bifurcating where forest plan involved 15 years of timber sales, preliminary injunction in place to prevent environmental harm, and plaintiffs requested partial vacatur of decision document). Parties are well aware of the types of errors at issue here and have had a full opportunity to address the seriousness of these errors and the potential consequences of vacatur. Additional remedy briefing would not only be contrary to local rules but is also unnecessary.

## CONCLUSION

For the foregoing reasons, Tribes respectfully request the Court enter judgment in their favor and vacate the JROD and Defendants' authorizations.

Respectfully submitted this 7th day of May, 2024.

*s/ Maile Tavepholjalern*

Maile Tavepholjalern (Alaska Bar. No. 1611094)
Hannah Payne Foster (Alaska Bar No. 2105045)
Ian S. Dooley (Alaska Bar No. 2006059)
EARTHJUSTICE

*Attorneys for Plaintiffs Orutsararmiut Native Council, Tuluksak Native Community, Organized Village of Kwethluk, Native Village of Eek, Native Village of Kwigillingok, and Chevak Native Village.*

*Orutsararmiut Native Council et al. v. U.S. Army Corps of Eng'rs et al.,*
Case No. 3:23-cv-00071-SLG                                              38

# CERTIFICATE OF COMPLIANCE WITH WORD LIMITS

I certify that this document contains 9,813 words, excluding items exempted by Local Civil Rule 7.4(a)(4), and complies with the word limits of Local Civil Rule 7.4(a)(1).

Respectfully submitted this 7th day of May, 2024.

*s/ Maile Tavepholjalern*
Maile Tavepholjalern (Alaska Bar. No. 1611094)
EARTHJUSTICE

**CERTIFICATE OF SERVICE**

I certify that on May 7, 2024, a copy of foregoing PLAINTIFFS' REPLY BRIEF UNDER LOCAL RULE 16.3 was served electronically on Albert Lin, Christopher C. Hair, Allison B. Rumsey, Ethan G. Shenkman, Eric B. Fjelstad, James N. Leik, Matthew Singer, Ronald W. Opsahl, Pilar Thomas, Adam R. Prinsen, Ryan D. Rainey, Matthew T. Findley, and Benjamin J. Farkash.

*s/ Maile Tavepholjalern*

Maile Tavepholjalern (Alaska Bar. No. 1611094)
EARTHJUSTICE
