# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ALASKA

ORUTSARARMIUT NATIVE COUNCIL,
*et al.*,

          *Plaintiffs,*

    v.

UNITED STATES ARMY CORPS OF
ENGINEERS, *et al.*,

          *Defendants,*

    and

DONLIN GOLD LLC, *et al.,*

          *Intervenor-Defendants.*

Case No. 3:23-cv-00071-SLG

## DECISION AND ORDER

Before the Court at Docket 59 is Plaintiffs' Opening Brief.[1]  Federal Defendants

responded in opposition at Docket 61.[2]  Intervenor-Defendants Donlin Gold LLC

("Donlin"), Calista Corporation ("Calista"), and the State of Alaska ("State") each

---

[1] Plaintiffs are Orutsararmiut Native Council; Tuluksak Native Community; Organized Village of Kwethluk; Native Village of Eek; Native Village of Kwigillingok; and Chevak Native Village.  Docket 24 at ¶ 1 (Am. Compl.).

[2] Federal Defendants are the United States Army Corps of Engineers ("Corps"); the United States Bureau of Land Management ("BLM"); the United States Department of the Interior ("Interior"); Colonel Damon Delarosa, in his official capacity as Commander, Alaska District, United States Army Corps of Engineers; Laura Daniel-Davis, in her official capacity as Principal Deputy Assistant Secretary, Land and Minerals Management, United States Department of the Interior; and Steven Cohn, in his official capacity as State Director, Bureau of Land Management, State of Alaska.  Docket 24 at ¶¶ 19–24.

responded in opposition at Dockets 70, 74, and 75, respectively.[3]  Plaintiffs replied at

Docket 82-2.  Oral argument was held on June 24, 2024.[4]

## BACKGROUND

This case is about Donlin's plan to build an open pit gold mine 10 miles north

of the village of Crooked Creek in the Kuskokwim River watershed in southwestern

Alaska.[5]  "The Kuskokwim River watershed is a basin encompassing approximately

50,200 [square miles] and is the second largest drainage in Alaska.  The Kuskokwim

River flows about 900 miles from the headwaters of the Kuskokwim Mountains in the

Alaska Interior southwest to the Bering Sea."[6]  Communities in the region use the

Kuskokwim River for subsistence hunting and fishing as well as inter-community

travel.[7]  Barges also traverse the Kuskokwim River to deliver cargo to nearby

residents.[8]  "Fish and aquatic resources are of central importance to the livelihood of

residents" in the Kuskokwim River watershed, and "[a]t least 27 species of

anadromous and resident freshwater fish are found in the Kuskokwim River

drainage."[9]

---

[3] The Native Village of Crooked Creek and the Alaska Congressional Delegation filed briefs as Amicus Curiae in support of Intervenor-Defendants at Docket 66-1 and Docket 77-2, respectively.

[4] Docket 92.

[5] AR_0016388.

[6] AR_0022359.

[7] AR_0021674.

[8] AR_0021674.

[9] AR_0022326.

Case No. 3:23-cv-00071-SLG, *Orutsararmiut Native Council, et al. v. U.S. Army Corps of Engineers, et al.*
Decision and Order
Page 2 of 36

Case 3:23-cv-00071-SLG   Document 99   Filed 09/30/24   Page 2 of 36

Cargo and fuel for Donlin's proposed mine operations would be transported by barge over 199 miles on the Kuskokwim River from Bethel, Alaska "to a port [to be] constructed at Jungjuk Creek," near the mine site.[10]  To build the port, Donlin would discharge roughly 21,774 cubic yards of fill into the Kuskokwim River.[11]  Donlin expects to conduct 89 barge trips per year during construction and 122 barge trips per year while operating the mine.[12]  Calista Corporation owns the mineral estate and a portion of the surface estate at the proposed mine site.[13]  The mine site "would have a total footprint of approximately 16,300 acres," and would include

> two open pits, a [waste rock facility], ore processing facilities, a tailing storage facility (TSF), water treatment plants, facilities to house the workforce, equipment to transport ore from the open pit to the processing plant, hydrologic control features (freshwater diversion dams, contact water dams, and a freshwater reservoir), and a power plant.[14]

To fuel the power plant, natural gas would be transported to the mine site "via a 316-mile, 14-inch diameter buried steel pipeline originating from an existing 20-inch natural gas pipeline near Beluga, Alaska."[15]  The mine would produce one million ounces of gold annually and is projected to be operational for 27 years.[16]

---

[10] AR_0016422; AR_0338501; *see* also AR_0019271 (map of project site).

[11] AR_0000688.

[12] AR_0016432.

[13] AR_0016385.  Kuskokwim Corporation owns the balance of the surface estate.  Docket 74 at 6.

[14] AR_0338499; AR_0338504.

[15] AR_0338500.

[16] AR_0016388.

Case No. 3:23-cv-00071-SLG, *Orutsararmiut Native Council, et al. v. U.S. Army Corps of Engineers, et al.*
Decision and Order
Page 3 of 36

Case 3:23-cv-00071-SLG   Document 99   Filed 09/30/24   Page 3 of 36

In July 2012, Donlin sought a permit from the Corps pursuant to Section 404 of the Clean Water Act ("CWA"), 33 U.S.C. § 1344, to allow for the discharge of "4,368,300-cubic yards of fill within 3,415-acres and 226,190-linear feet of [waters of the United States]."[17]   Donlin also applied for a right-of-way from BLM to construct portions of the proposed natural gas pipeline crossing federal land.[18]

In April 2018, as required by the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, the Corps prepared a final environmental impact statement ("FEIS"), with BLM participating as a cooperating agency, analyzing the environmental effects of Donlin's proposed mine.[19]   In August 2018, the Corps and BLM issued a Joint Record of Decision ("JROD") authorizing the discharge of fill into waters of the United States pursuant to Section 404 and granting Donlin a right-of-way over federal lands.[20]   In the JROD, BLM also determined that approval of the right-of-way would not violate Section 810 of the Alaska National Interest Lands Conservation Act ("ANILCA"), 16 U.S.C. § 3101 *et seq.*[21]   In April 2023, Plaintiffs sued Federal Defendants pursuant to the Administrative Procedure Act ("APA"), asserting that the FEIS and JROD violated NEPA, ANILCA, and the CWA.[22]

---

[17] AR_0000674; AR_0016455; AR_0019267.

[18] AR_0019268; AR_0338556.

[19] AR_0019268.  BLM adopted the FEIS prepared by the Corps.  AR_0000675.

[20] AR_0000662; AR_0000679; AR_0000681.

[21] AR_0000683.

[22] Docket 1; *see also* Docket 24 at ¶¶ 81–102 (Am. Compl.).

Case No. 3:23-cv-00071-SLG, *Orutsararmiut Native Council, et al. v. U.S. Army Corps of Engineers, et al.*
Decision and Order
Page 4 of 36

Case 3:23-cv-00071-SLG   Document 99   Filed 09/30/24   Page 4 of 36

# JURISDICTION

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, which "confer[s] jurisdiction on federal courts to review agency action, regardless of whether the APA of its own force may serve as a jurisdictional predicate."[23]

# LEGAL STANDARD

Pursuant to the APA, a reviewing court shall set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[24]  Agency action is arbitrary and capricious if it:

> relie[s] on factors which Congress has not intended it to consider, entirely fail[s] to consider an important aspect of the problem, offer[s] an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it c[an]not be ascribed to a difference in view or the product of agency expertise.[25]

A court's review of whether an agency action is arbitrary and capricious should be "searching and careful," but "narrow," as a court may not substitute its judgment for that of the administrative agency.[26]  "[D]eference to the agency's decisions is especially warranted when reviewing the agency's technical analysis and judgments,

---

[23] *Califano v. Sanders*, 430 U.S. 99, 105 (1977).

[24] 5 U.S.C. § 706(2)(A).

[25] *Protect Our Cmtys. Found. v. LaCounte*, 939 F.3d 1029, 1034 (9th Cir. 2019) (alterations in original) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983)).

[26] *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989) (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)).

Case No. 3:23-cv-00071-SLG, *Orutsararmiut Native Council, et al. v. U.S. Army Corps of Engineers, et al.*
Decision and Order
Page 5 of 36

Case 3:23-cv-00071-SLG   Document 99   Filed 09/30/24   Page 5 of 36

based on an evaluation of complex scientific data within the agency's technical expertise."[27] "Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."[28] "Whether agency action is 'not in accordance with law' is a question of statutory interpretation, rather than an assessment of reasonableness in the instant case."[29]

## DISCUSSION

### I. National Environmental Policy Act

The purpose of NEPA is to "foster[] informed decision-making and informed public participation."[30] To achieve this end, "[b]efore an agency may approve a particular project, it must prepare a 'detailed statement . . . [on, *inter alia*,] the environmental impact of the proposed action,' 'any adverse environmental effects which cannot be avoided should the proposal be implemented,' and 'alternatives to the proposed action.'"[31] The Council on Environmental Quality's regulations

---

[27] *Native Vill. of Point Hope v. Salazar*, 680 F.3d 1123, 1130 (9th Cir. 2012) (internal quotation marks and citation omitted).

[28] *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (internal quotation marks and citation omitted).

[29] *Singh v. Clinton*, 618 F.3d 1085, 1088 (9th Cir. 2010) (citing *Nw. Env't Advocs. v. EPA*, 537 F.3d 1006, 1014 (9th Cir. 2008)).

[30] *Sovereign Inupiat for a Living Arctic v. Bureau of Land Mgmt.*, 701 F. Supp. 3d 862, 876 (D. Alaska 2023) (quoting *Montana Wilderness Ass'n v. Connell*, 725 F.3d 988, 1005 (9th Cir. 2013)) (internal quotation marks omitted).

[31] *Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 563 F.3d 466, 474 (D.C. Cir. 2009) (alteration in original) (quoting 42 U.S.C. § 4332(C)(i)–(iii)).

Case No. 3:23-cv-00071-SLG, *Orutsararmiut Native Council, et al. v. U.S. Army Corps of Engineers, et al.*
Decision and Order
Page 6 of 36

Case 3:23-cv-00071-SLG   Document 99   Filed 09/30/24   Page 6 of 36

implementing NEPA describe the process that an agency must follow when issuing the required statement, called an Environmental Impact Statement ("EIS") as well as the contents of an EIS.[32]

Plaintiffs maintain that the Corps' FEIS violated NEPA for two reasons: it failed to analyze a larger spill of tailings from the tailings storage facility and it did not disclose and address the purportedly more negative health impacts found in a State-prepared Health Impact Assessment.[33] The Court addresses both arguments in turn.

### a. Larger Tailings Spill

As part of the mining complex, Donlin would construct a tailings storage facility ("TSF") to contain a slurry of water and tailings.[34] Tailings are the byproduct of the process Donlin would use to extract gold.[35] The tailings would contain chemicals including arsenic, antimony, thallium, and mercury.[36] The 2,351-acre TSF would be built in the Anaconda Creek Valley and would have the capacity to store 568 million

---

[32] *See* 40 C.F.R. pt. 1502 (2018). The Council on Environmental Quality published a new rule, effective September 14, 2020, that substantially revised the regulations implementing NEPA. However, citations in this case are to the 2018 Code of Federal Regulations, reflecting the regulations originally promulgated in 1978, with a minor substantive amendment in 1986. *See* National Environmental Policy Act—Regulations, 43 Fed. Reg. 55978 (Nov. 29, 1978); National Environmental Policy Act Regulations; Incomplete or Unavailable Information, 51 Fed. Reg. 15618 (Apr. 25, 1986). This is because the 2020 NEPA regulations only apply to NEPA processes begun after September 14, 2020, although agencies have the option to apply the 2020 NEPA regulations to ongoing activities begun before that date. 40 C.F.R. § 1506.13 (2020).

[33] Docket 59 at 27–41.

[34] AR_0338525; AR_0012887; *see also* AR_0338529.

[35] AR_0016393–94.

[36] AR_0012916–17.

Case No. 3:23-cv-00071-SLG, *Orutsararmiut Native Council, et al. v. U.S. Army Corps of Engineers, et al.*
Decision and Order
Page 7 of 36

Case 3:23-cv-00071-SLG   Document 99   Filed 09/30/24   Page 7 of 36

tons, or 335,000 acre-feet, of tailings.[37]  The TSF would be constructed on bedrock using compacted rockfill and "the height of the tailings dam at completion would be 471 feet."[38]  The TSF would be "lined with a 60-mil (0.06-inch) linear low-density polyethylene (LLDPE) composite liner."[39]

Donlin held an Early Stage Failure Modes and Effects Analysis Workshop ("FMEA") to analyze potential tailings spill scenarios.[40]  "The FMEA indicated that a moderate or major consequence could be identified as a discharge of 2 million cubic meters of tailings[,]" and, "[w]hile the release under any specific failure mode could be greater or less than this volume, the FMEA team determined based on their collective experience that this was a representative volume for a low probability, high consequence release."[41]  The FMEA therefore recommended analyzing a tailings spill scenario of "[a]n unplanned release of up to two million cubic meters of tailings and contaminated water from the TSF from either a partial breach of the dam and resulting downstream failure or a liner rupture leads to a sinkhole and outflow of tailings through the underdrain."[42]  These two failure modes "represent the largest of

---

[37] AR_0338525.

[38] AR_0338525.

[39] AR_0338525.

[40] AR_0026684–87.

[41] AR_0123957; *see also* AR_0114477 ("There is no technical basis for this volume, rather it was considered as representative of a significant release consistent with that described in the FMEA.").

[42] AR_0026687.  The first mode of TSF failure, a partial breach of the dam, specified 2 million cubic meters as the volume of released tailings and assumed that the breach would "occur near [the] end of mine life with [a] full pond, so that even a partial breach [would] lead[] to [a] significant tailings

Case No. 3:23-cv-00071-SLG, *Orutsararmiut Native Council, et al. v. U.S. Army Corps of Engineers, et al.*
Decision and Order
Page 8 of 36

Case 3:23-cv-00071-SLG   Document 99   Filed 09/30/24   Page 8 of 36

the low probability-high consequence failure modes identified in the Early Stage FMEA workshop . . . [and] [b]oth were characterized as moderately high risk and unlikely to occur, but were considered by the participants to be the most likely ways a significant release of tailings could occur."[43]

> The Early Stage FMEA also identified several modes of catastrophic failure of the TSF dam, all of which were considered very unlikely to occur; that is, conceivable but only in extreme circumstances and given a probability of 1 in 1,000 years. These were not carried forward for further analysis in the EIS as they represent "worst-case" spill scenarios.[44]

Consistent with the FMEA's recommendation, the FEIS analyzed the impacts of a partial tailings dam failure and an associated release of up to "2.6 million cubic yards (1,607 acre-feet) of tailings and contaminated water from the TSF" "from either a partial breach of the dam and resulting downstream failure or a liner rupture leads to a sinkhole and outflow of tailings through the underdrain."[45]  The FEIS noted that "the likelihood of occurrence for tailings spills cannot be described by spill volume, as the likelihood of a tailings release is largely independent of spill size[,]" and "a breach of the tailings dam may not result in a full release of the contents behind the dam, but

---

release."  AR_0026726.  The second mode of failure, a liner rupture and release of tailings from the underdrain, did not specify a volume of released tailings but noted that "[l]oss of 20% of tailings would be enough to lead to critical consequences."  AR_0026726.

[43] AR_0012886.  The FMEA rated spill scenarios based on the likelihood that they would occur, with an unlikely rating indicating that the scenario would occur once every 200 years.  AR_0012886; *see also* AR_0026686–87 (AECOM technical memorandum).

[44] AR_0012887 (internal citation omitted).  Some participants in the FMEA thought that the likelihood of a catastrophic spill was unlikely, rather than very unlikely.  AR_0026726.

[45] AR_0013011; AR_0012886.

Case No. 3:23-cv-00071-SLG, *Orutsararmiut Native Council, et al. v. U.S. Army Corps of Engineers, et al.*
Decision and Order
Page 9 of 36

could release a significant portion of the contents."[46]

The FEIS modeled that a release of 2.6 million cubic yards of tailings and water would deposit tailings in the Anaconda Creek Valley up to eight feet deep, and "[w]ater and suspended solids would be transported downstream to the Kuskokwim River and beyond."[47]  It concluded that a spill of tailings and water could cause "irreversible impacts on soil character [and] quality" and the "complete removal of antimony and arsenic enriched tailings from the inundation area is unlikely to be possible."[48]  While the concentration of mercury in the tailings would be below Alaska Department of Environmental Conservation soil cleanup guideline levels, concentrations of arsenic, antimony, and thallium would exceed soil cleanup guidelines.[49]  If the tailings dam failed, releasing water and tailings, "[i]mpacts to surface water, groundwater, and sediment quality resulting from released solids would potentially persist over decadal time scales, whereas impacts resulting from the water only scenario would likely diminish over timescales of weeks."[50]  Released

---

[46] AR_0012886–87.

[47] AR_0012907–09; AR_0012911.  If only water was released, "it would take approximately 24 to 25 hours for the release front to arrive at the confluence of Crooked Creek with the Kuskokwim River with a maximum flow rate of approximately 600 cfs.  The predicted flow depth was approximately 1 foot or less at the confluence of Crooked Creek with the Kuskokwim River."  AR_0012911; *see also* AR_0012910.

[48] AR_0012919–20.

[49] AR_0012917.

[50] AR_0012962.  "[C]hemical impacts to surface water quality from a TSF water only release scenario are comparatively less than those of tailings and water mixture."  AR_0012951.

Case No. 3:23-cv-00071-SLG, *Orutsararmiut Native Council, et al. v. U.S. Army Corps of Engineers, et al.*
Decision and Order
Page 10 of 36

material could also permanently erode or bury native vegetation and wetlands and decrease nutrients in soil.[51]

In conducting its FEIS, the Corps considered an event to be "reasonably foreseeable" such that it needed to be accounted for if it was "sufficiently likely" or had "a reasonable likelihood of occurrence."[52] The Corps declined to consider a tailings failure scenario where 20% or more of the tailings would be released because the "request does not appear to have any precedent in NEPA, nor is it industry practice to analyze or plan for an arbitrary failure rate that loses 20 percent of the material retained by a dam."[53]

Plaintiffs assert—and no other party disputes—that the tailings failure studied in the FEIS represents just 0.5% of the TSF's maximum capacity.[54] Plaintiffs further calculate that this amounts to less than 1% of the total volume of tailings beginning in year 14, reasoning that the "volume of tailings added each year would be around 19.56 million cubic yards—528 million cubic yards divided by the estimated mine life of around 27 years" such that "2.6 million cubic yards as a percentage of tailings volume contained would decrease over the mine's active life… [to] less than 1

_____

[51] AR_0012983–86.

[52] Docket 98 at 15–16; AR_0012887.

[53] AR_0013636–37.

[54] Docket 59 at 15 & n.1 (explaining that the FEIS analyzed a 2.6 million cubic yard spill out of a total projected volume of 528 million cubic yards); Docket 98 at 26; *see also* Docket 24 at ¶ 4 ("Both agencies consider a spill of just 0.5 percent of the tailings capacity"); Docket 35 at ¶ 4 ("Federal Defendants admit the allegations in the fourth sentence of Paragraph 4.").

Case No. 3:23-cv-00071-SLG, *Orutsararmiut Native Council, et al. v. U.S. Army Corps of Engineers, et al.*
Decision and Order
Page 11 of 36

percent from year 14 onward."[55]

NEPA "requires that each agency assess the environmental consequences of major [f]ederal actions by following certain procedures during the decision-making process."[56] "NEPA requires agencies to evaluate the direct and indirect effects of the proposed action."[57] "Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems."[58] An agency need only consider "indirect effects that are 'reasonably foreseeable' or those that 'a person of ordinary prudence would take into account in reaching a decision.'"[59]

Plaintiffs maintain that a larger tailings spill, even a catastrophic one, is reasonably foreseeable and that therefore the Corps violated NEPA by only considering a spill amounting to 0.5% of the TSF's capacity.[60] Plaintiffs also contend that the Corps "erroneously applies a 'reasonable likelihood' standard rather than a

---

[55] Docket 59 at 15 n.1.

[56] *Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 563 F.3d 466, 474 (D.C. Cir. 2009) (internal quotation marks omitted); *see also* 42 U.S.C. § 4332(C).

[57] *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 737 (9th Cir. 2020) [hereinafter *Liberty*] (citing 40 C.F.R. § 1502.16).

[58] 40 C.F.R. § 1508.8(b).

[59] *Liberty*, 982 F.3d at 737 (alteration omitted) (first quoting 40 C.F.R. § 1508.8(b); then quoting *EarthReports, Inc. v. FERC*, 828 F.3d 949, 955 (D.C. Cir. 2016); and then citing 40 C.F.R. § 1502.22(b)).

[60] Docket 59 at 30–31.

'reasonably foreseeable' standard to determine what tailings spill impacts merited analysis," and "erroneously excludes larger-volume tailings spills from analysis on the basis that they were a 'worst-case' scenario."[61]

Federal Defendants counter that the Corps did not need to consider a larger tailings spill, as "NEPA does not require federal agencies to examine the environmental impacts of 'remote and highly speculative consequences.'"[62] They maintain that "[t]he record reveals that the risk of a larger volume tailings spill is so remote that, under Ninth Circuit precedent, the agencies acted reasonably and in accord with NEPA in undertaking their chosen analysis[,]" as the agencies concluded that a catastrophic failure of the TSF was "very unlikely" with a probability of occurrence of 1 in 1,000 years.[63] And, contrary to Plaintiffs' claim, Federal Defendants contend that the agencies did not apply an erroneous legal standard; rather, "the agencies acted consistent with Ninth Circuit precedent," as "[a] reasonably thorough discussion of the significant aspects of the *probable* environmental consequences is all that is required by an EIS.'"[64]

The Court finds that Federal Defendants violated NEPA by failing to consider a larger tailings spill and by characterizing a catastrophic spill as a "worst case" and

---

[61] Docket 59 at 33.

[62] Docket 61 at 24 (quoting *Ground Zero Ctr. for Non-Violent Action v. U.S. Dep't of Navy*, 383 F.3d 1082, 1090 (9th Cir. 2004) [hereinafter *Ground Zero*]).

[63] Docket 61 at 25.

[64] Docket 61 at 28 (emphasis in original) (quoting *Ground Zero*, 383 F.3d at 1089-90).

Case No. 3:23-cv-00071-SLG, *Orutsararmiut Native Council, et al. v. U.S. Army Corps of Engineers, et al.*
Decision and Order
Page 13 of 36

declining to assess such a scenario on that basis. A spill of more than 0.5% of the tailings volume is reasonably foreseeable because "a person of ordinary prudence would take [one] into account in reaching a decision."[65] The record shows that tailings spills of over 0.5% of the total volume are reasonably foreseeable, and, in fact, that this number falls far below the statistics. A 2011 presentation summarized previous studies and found that on average, tailings released due to dam breaks ranged from 20–40% of total tailings volume.[66] Similarly, a 2010 report on tailings dam failures indicated that "[u]pon dam breakage, the released tailings generally amount to about one-fifth of those contained within the facilities."[67] A tailings spill larger than 0.5% is not, as Federal Defendants claim, "so remote" that NEPA does not require the Corps to consider it.[68] Further, the FMEA recognized that a "[l]oss of 20% of tailings would be enough to lead to critical consequences" in a scenario where the liner ruptured; while the FEIS recognizes that "a breach of the tailings dam may not result in a full release of the contents behind the dam, but could release a significant portion of the contents[,]" it does not explain how 0.5% of the tailings represents a "significant

---

[65] *Liberty*, 982 F.3d at 737 (alteration omitted) (internal quotation marks and citations omitted); *see also San Luis Obispo Mothers for Peace v. Nuclear Regul. Comm'n*, 449 F.3d 1016, 1032 (9th Cir. 2006) [hereinafter *Mothers for Peace*] ("If the risk of a terrorist attack is not insignificant, then NEPA obligates the NRC to take a 'hard look' at the environmental consequences of that risk.").

[66] AR_0338844.

[67] AR_0339880.

[68] Docket 61 at 25.

Case No. 3:23-cv-00071-SLG, *Orutsararmiut Native Council, et al. v. U.S. Army Corps of Engineers, et al.*
Decision and Order
Page 14 of 36

portion" of the TSF's contents.[69] The Corps therefore arbitrarily determined that "a scenario of 20 percent of the contents does not appear to have any precedent in NEPA. . . ."[70]

Federal Defendants rely on *Ground Zero* to support their claim that the Corps did not need to consider the risk of a larger volume tailings spill.[71] However, in that case, the Ninth Circuit held that the agency did not need to consider the risk of an explosive missile accident because the chance of such an accident was less than 1 in 1 million.[72] Here, the risk of a catastrophic tailings spill is significantly higher, at 1 in 1,000 (0.1%) in a given year or up to 2 in 100 (2%) in 20 years.[73] To borrow an analogy from Plaintiffs and to put these numbers into perspective, these same odds for the risk of an airplane crash would likely deter nearly anyone from flying.[74] Because a tailings spill larger than .5% of the total tailings volume is reasonably foreseeable, the FEIS should have considered a larger spill.

Additionally, the Corps erroneously categorized a catastrophic spill as a worst case based on its low probability of occurrence. In *San Luis Obispo Mothers for Peace v. Nuclear Regulatory Commission*, the Nuclear Regulatory Commission

---

[69] AR_0012887; AR_0026726.

[70] AR_0013636.

[71] Docket 61 at 24–25.

[72] *Ground Zero*, 383 F.3d at 1090.

[73] AR_0026723; AR_0026726.

[74] Docket 98 at 39.

Case No. 3:23-cv-00071-SLG, *Orutsararmiut Native Council, et al. v. U.S. Army Corps of Engineers, et al.*
Decision and Order
Page 15 of 36

("NRC") "decided categorically that NEPA does not require consideration of the environmental effects of potential terrorist attacks" because "NEPA does not require a 'worst-case' analysis."[75] Reversing, the Ninth Circuit held that, "[w]hile it is true that the agency is not required to consider consequences that are 'speculative,' the NRC's argument wrongly labels a terrorist attack the worst-case scenario because of the low or indeterminate probability of such an attack."[76] Federal Defendants made the same mistake here. The FEIS relied on the FMEA's determination that a catastrophic failure was "very unlikely" or given a probability of 1 in 1,000 years, and, on that basis, declined to "carr[y] forward [catastrophic failure scenarios] for further analysis in the EIS as they represent 'worst-case' spill scenarios."[77] But, as the Ninth Circuit explained in *Mothers for Peace*, a scenario's low probability of occurrence does not automatically render it a speculative worst case scenario insulated from further NEPA analysis. Federal Defendants therefore erred under NEPA by eliminating a catastrophic spill from consideration based solely on its low probability of occurrence.

As such, the Court finds that the Corps violated NEPA by failing to consider a tailings spill larger than 0.5% of the TSF's total volume and by declining to assess a catastrophic tailings spill based solely on its low probability of occurrence. The two

---

[75] *Mothers for Peace*, 449 F.3d at 1028.

[76] *Id.* at 1033–34.

[77] AR_0012887.

Case No. 3:23-cv-00071-SLG, *Orutsararmiut Native Council, et al. v. U.S. Army Corps of Engineers, et al.*
Decision and Order
Page 16 of 36

purposes of NEPA require the consideration of a large tailings spill: "[f]irst, ensuring that the agency will have and will consider detailed information concerning significant environmental impacts; and, second, ensuring that the public can both contribute to that body of information, and can access the information that is made public."[78]

### b. State's Health Impact Assessment

Plaintiffs' next NEPA challenge concerns the mine's impact on human health, which the Corps analyzed in the FEIS.[79] In the FEIS, "[i]mpacts were evaluated using Alaska Department of Health and Social Services (ADHSS) methodology."[80] Baseline health data, which was procured by the State, was "condensed and summarized for this EIS. Where available, additional data [were] also . . . incorporated from publicly available sources . . . ."[81]

Using ADHSS's methodology, the FEIS rated potential impacts to human health from the project based on two dimensions: the severity of the positive and/or negative impact (based on considerations of the impact's health effect, magnitude, duration, and geographic extent) and the likelihood of such impact.[82] The severity

---

[78] *Mothers for Peace*, 449 F.3d at 1034 (citing *Dep't of Trans. v. Pub. Citizen*, 541 U.S. 752, 768 (2009)).

[79] *See* AR_0020998–1105.

[80] AR_0020998.

[81] AR_0020999; *see also* AR_0021006 ("In some cases, the information presented in [the State HIA] was updated or supplemented by reference to other publicly available sources.").

[82] AR_0021000. Each criterion—health effect, magnitude, duration, and geographic extent—is rated 0–3 based on severity of impact, and then each number is summed to result in a severity total, which could range from zero to 12. AR_0021043–44 (rating system). There are seven categories of likelihood, including extremely unlikely (<1%), about as likely as not (33–66%), and virtually certain

and likelihood ratings correlate to impact categories of 1 through 4, a scale intended to guide decision-makers in addressing a project's potential health impacts.[83] The FEIS rated each potential health impact at three different stages of the project: construction, operation, and closure, although the FEIS analyzed some health impacts as a whole across all three stages.[84]

The State drafted a Health Impact Assessment ("HIA"), which the EIS states "was used as one of the primary resources for [the human health] section of the EIS."[85] Many of the ratings provided in the FEIS differ from those in the State HIA; generally, the FEIS rated negative impacts as less likely than the State HIA, which resulted in lower impact categories.[86] For example, the FEIS evaluated the potential for an increase in unintentional accidents and injuries and associated morbidity and mortality rates due to water transportation.[87] The FEIS assigned the impact to health from water transportation a severity score of 7–8 (7 during construction and 8 during operations and closure), and a likelihood of 1–10%, or very unlikely.[88] The

---

(>99%). AR_0021044.

[83] AR_0021041; *see also* AR_0021044; AR_0021045 ("ADHSS does not provide narrative descriptions for these numeric impact category rankings and only suggests that they be used to propose recommendations for actions.").

[84] AR_0021044.

[85] AR_0020998.

[86] *Compare* AR_0021053, AR_0021059, AR_0021076, AR_0021080, AR_0021085, AR_0021088 (FEIS), *with* AR_0084570–73 (State HIA); *see also* Docket 59 at 18–21 (detailing differences).

[87] AR_0021059.

[88] AR_0021044; AR_0021059.

Case No. 3:23-cv-00071-SLG, *Orutsararmiut Native Council, et al. v. U.S. Army Corps of Engineers, et al.*
Decision and Order
Page 18 of 36

Case 3:23-cv-00071-SLG   Document 99   Filed 09/30/24   Page 18 of 36

combination of those two scores placed the health effect from accidents and injuries due to water transport in a category 2.[89]  The State HIA rated this effect differently, assigning it a severity of 7 and a likelihood of 90–99%, or very likely, resulting in a category 3.[90]  The FEIS also evaluated the impact to food security and the impact to subsistence resources, finding that the former would be positively impacted and the latter negatively so.[91]  The State HIA grouped these impacts together, finding a negative category 3 impact.[92]  Further, the FEIS rated the potential impacts of psychological stress, substance abuse, and family stress and stability separately, finding that each could be positively or negatively impacted, with impact categories of 1–2.[93]  The State HIA evaluated these impacts together, finding a negative impact, category 2.[94]  Regarding positive impacts, the FEIS placed three of five positive impacts in higher categories than the State HIA.[95]

The FEIS explained that "[i]mpact ratings were developed using professional judgment, to the extent possible, considering baseline data gaps and available

_____

[89] AR_0021059.

[90] AR_0084571.

[91] AR_0021080.

[92] AR_0084571.

[93] AR_0021053.

[94] AR_0084570.

[95] Compare AR_0084570–71, with AR_0021053, AR_0021080.

Case No. 3:23-cv-00071-SLG, Orutsararmiut Native Council, et al. v. U.S. Army Corps of Engineers, et al.
Decision and Order
Page 19 of 36

information pertaining project design and planned mitigation measures."[96] The FEIS cautioned that, "[w]hile the framework used for the evaluation of health impacts is generally consistent with ADHSS guidance, . . . any assessment of potential impacts is subject to several types of uncertainty," including "uncertainty in trying to predict the aggregate of individual choices at a community level in terms of overall severity, likelihood and impact rating."[97] "A particular source of uncertainty is the rating system for 'likelihood' of impacts that is employed by the ADHSS guidance."[98] For purposes of the FEIS,

> estimation of likelihood is based on a general understanding of baseline health status and trends, project description including proposed programs and measures to avoid or minimize health impacts, the detailed evaluation of certain types of impacts in other sections of the EIS (e.g., air quality, water quality, socio-economics, subsistence, transportation) and publicly available literature regarding these impacts on other, similar projects. The actual likelihood of the impacts may vary from the estimated level.[99]

The regulations implementing NEPA provide that an FEIS "shall discuss at appropriate points in the final statement any responsible opposing view which was not adequately discussed in the draft statement and shall indicate the agency's response to the issues raised."[100] Accordingly, an agency must "disclose and

---

[96] AR_0021004.

[97] AR_0021042.

[98] AR_0021043.

[99] AR_0021043.

[100] 40 C.F.R. § 1502.9(b) (2018).

Case No. 3:23-cv-00071-SLG, *Orutsararmiut Native Council, et al. v. U.S. Army Corps of Engineers, et al.*
Decision and Order
Page 20 of 36

respond to" "evidence and opinions directly challeng[ing] the scientific basis upon which the Final EIS rests and which is central to it."[101]  The "failure to disclose and analyze these opposing viewpoints violates NEPA and 40 C.F.R. § 1502.9(b) . . . ."[102]

Plaintiffs maintain that the Corps violated NEPA by "not reveal[ing] significantly worse health effects contained in the state HIA," which Plaintiffs contend is a responsible opposing viewpoint requiring disclosure and analysis.[103]  Plaintiffs also contend that the FEIS's omission of the State HIA's findings is misleading and therefore violates the requirement that an EIS "provide [a] 'full and fair discussion' of significant environmental impacts."[104]  Federal Defendants disagree, contending that the State HIA is not an opposing viewpoint, and that the ratings in the FEIS are more consistent with the State HIA than Plaintiffs suggest.[105]  Donlin maintains that the Corps did not mislead the public by failing to disclose that the State HIA ratings differed from those in the FEIS because, while the FEIS noted that the State HIA was one of many sources consulted and that the impact ratings were developed using ADHSS methodology, the FEIS did not represent that it reached the same

_____

[101] *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 349 F.3d 1157, 1167 (9th Cir. 2003) [hereinafter *CBD*] (citations omitted).

[102] *Id.* (citations omitted).

[103] Docket 59 at 35–41.

[104] Docket 59 at 40 (quoting 40 C.F.R. § 1502.1 (2018)).

[105] Docket 61 at 39–41.  Intervenor-Defendants Donlin and the State raise similar arguments.  Docket 70 at 28–30; Docket 75 at 22–24.

Case No. 3:23-cv-00071-SLG, *Orutsararmiut Native Council, et al. v. U.S. Army Corps of Engineers, et al.*
Decision and Order
Page 21 of 36

Case 3:23-cv-00071-SLG   Document 99   Filed 09/30/24   Page 21 of 36

conclusions as the State HIA.[106]

The Court finds that the State HIA is not a responsible opposing viewpoint because it does not "directly challenge the scientific basis upon which the Final EIS rests."[107] The State HIA does not challenge the scientific basis or the underlying data on which the Corps relied to reach the health impact ratings in the FEIS; rather, the State HIA relied on the same baseline information, with the FEIS supplementing the data with additional sources. And the ratings contained in the State HIA are not in opposition to those in the FEIS. To be sure, the ratings are not identical, and, on the whole, the FEIS concluded that the health impacts of the Donlin Mine would be less negative and more positive than the State HIA. The FEIS would have better informed the public and the decision-makers if it had acknowledged that its impact ratings differed from the State HIA. But the FEIS acknowledged the uncertainties inherent in the rating system and explained that the ratings in the FEIS were the result of the Corps' professional judgment. The Court finds that the State HIA is not an opposing viewpoint that required disclosure and further discussion in the FEIS.

Plaintiffs rely on three cases to support their assertion that the State HIA is a responsible opposing viewpoint: *Center for Biological Diversity v. United States Forest Service*, *Friends of the Earth v. Hall*, and *Seattle Audubon Society v. Espy*.[108]

---

[106] Docket 70 at 33.

[107] *CBD*, 349 F.3d at 1167 (citations omitted).

[108] Docket 59 at 38 (first citing *CBD*, 349 F.3d at 1163–64, 1167; then citing *Seattle Audubon Soc. v. Espy*, 998 F.2d 699, 703–04 (9th Cir. 1993); and then citing *Friends of the Earth v. Hall*, 693 F. Supp.

Case No. 3:23-cv-00071-SLG, *Orutsararmiut Native Council, et al. v. U.S. Army Corps of Engineers, et al.*
Decision and Order
Page 22 of 36

None compel the Court to reach a different conclusion.

In *Center for Biological Diversity*, the Ninth Circuit held that the United States Forest Service violated NEPA by failing to disclose and address a responsible opposing viewpoint.[109] In that case, the Service established a committee to evaluate the habitat needs of the northern goshawk.[110] The committee published a report that concluded that the goshawk was a habitat generalist. The Service then proposed amending the forest and land management plans to incorporate guidelines for goshawk habitat management and began the EIS process.[111] During that process, various state and federal agencies submitted comments and scientific evidence refuting the committee's finding that the goshawk was a habitat generalist.[112] In the FEIS, "the Service did not mention or respond to comments challenging the agency's conclusion that goshawks are habitat generalists."[113] The Ninth Circuit found that this failure violated NEPA and 40 C.F.R. § 1502.9.[114] The parties did not dispute that the concerns raised about the goshawk's habitat were responsible opposing viewpoints that contradicted the Service's conclusion that the goshawk was a habitat

---

904, 933–34 (W.D. Wash. 1988)).

[109] *CBD*, 349 F.3d at 1167.

[110] *Id.* at 1160.

[111] *Id.* at 1160–61.

[112] *Id.* at 1161–64.

[113] *Id.* at 1164–65.

[114] *Id.* at 1167.

generalist.[115]

This case is distinguishable. First, the parties here dispute whether the State HIA is an opposing viewpoint. Second, the scientific evidence that the Service failed to address in *Center for Biological Diversity* directly undermined the central basis for the committee's goshawk habitat management recommendations. Here, as noted above, the State HIA does not directly challenge the FEIS's health impact findings or the scientific basis on which they rest. Instead, after considering data from the State HIA and additional information, the FEIS reached slightly different conclusions as to the health impacts of the mine.

In *Friends of the Earth*, a district court held that the Corps violated NEPA by "fail[ing] . . . to acknowledge the opposing views of the [National Marine Fisheries Service], [Fish and Wildlife Service], and [a doctor] concerning the extent and effect of the mass released contaminants" of a proposed dredge and fill operation.[116] Again, as noted above, the State HIA does not oppose the FEIS's health effect ratings. And the portion of *Seattle Audubon* that Plaintiffs refer to in their brief—the court's holding that the agency violated NEPA by failing to address an expert opinion raising an uncertainty surrounding the scientific evidence upon which the agency's decision rested—has subsequently been discredited by the Ninth Circuit.[117]

---

[115] *Id.* at 1167.

[116] 693 F. Supp. at 915, 933-34.

[117] *Lands Council v. McNair*, 537 F.3d 981, 1001 (9th Cir. 2008) (en banc) (citing *Seattle Audubon*, 998 F.2d at 704) ("We have previously faulted the Forest Service for not addressing uncertainties relating to a project 'in any meaningful way' in an EIS. But none of NEPA's statutory provisions or

Case No. 3:23-cv-00071-SLG, *Orutsararmiut Native Council, et al. v. U.S. Army Corps of Engineers, et al.*
Decision and Order
Page 24 of 36

Case 3:23-cv-00071-SLG   Document 99   Filed 09/30/24   Page 24 of 36

The Court also finds that the Corps did not mislead the public by failing to disclose the State HIA ratings in the FEIS.  While the Corps could have been more upfront about the differences between the ratings in the FEIS and the HIA, the failure to include them was not misleading.  The FEIS "provide[d] [a] full and fair discussion of significant environmental impacts" as they related to human health.[118]

In sum, the Court finds that the Corps did not violate NEPA by failing to disclose or further discuss the State HIA's health impact ratings.

## II.     Alaska National Interest Lands Conservation Act

Plaintiffs contend that, in failing to consider the impact of a larger tailings spill on subsistence, BLM violated § 810 of the Alaska National Interest Lands Conservation Act ("ANILCA").[119]  "The purpose of ANILCA § 810 is to protect Alaskan subsistence resources from unnecessary destruction," but it "does not prohibit all federal land use actions which would adversely affect subsistence resources."[120]  Rather, it "sets forth a procedure through which such effects must be considered and provides that actions which would significantly restrict subsistence uses can only be undertaken if they are necessary and if the adverse effects are minimized."[121]

---

regulations requires the Forest Service to affirmatively present every uncertainty in its EIS.  Thus, we hold that to the extent our case law suggests that a NEPA violation occurs every time the Forest Service does not affirmatively address an uncertainty in the EIS, we have erred.").

[118] 40 C.F.R. § 1502.1 (2018).

[119] Docket 59 at 29–30, 34–35; 16 U.S.C. § 3120.

[120] *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 544 (1987).

[121] *Id.*

ANILCA § 810 establishes "a two-step process."[122] First, the agency determines whether the contemplated action "may significantly restrict subsistence use" by evaluating (1) "the effect of such use, occupancy, or disposition [of public lands] on subsistence uses and needs," (2) "the availability of other lands for the purposes sought to be achieved," and (3) "other alternatives which would reduce or eliminate the use, occupancy, or disposition of public lands needed for subsistence purposes" (referred to as the Tier-1 evaluation).[123] Second, if the agency determines that the proposed action may significantly restrict subsistence use, then it "must comply with the notice and hearing procedures" laid out in § 810(a)(1)-(3) (Tier-2 evaluation).[124]

The FEIS included a § 810 review, which analyzed the same tailings spill scenario and concluded that "[a] tailings dam failure could not be cleaned up easily and quickly, its effects would continue long-term, and the failure would affect subsistence fish resources in communities downriver from the mine. This scenario would have major impacts to subsistence resources for the entire Kuskokwim River watershed."[125] In the JROD, BLM concluded that the mine would significantly restrict subsistence uses but that the "issuance of a [right-of-way] for this action would be

_____

[122] *Kunaknana v. Clark*, 742 F.2d 1145, 1150–51 (9th Cir. 1984) (analyzing 16 U.S.C. § 3120(a)).

[123] *Id.*; 16 U.S.C. § 3120(a).

[124] *Kunaknana*, 742 F.2d at 1151.

[125] AR_0016211.

Case No. 3:23-cv-00071-SLG, *Orutsararmiut Native Council, et al. v. U.S. Army Corps of Engineers, et al.*
Decision and Order
Page 26 of 36

necessary and consistent with sound principles for the utilization of public lands."[126]

Plaintiffs challenge BLM's compliance with § 810's Tier-1 evaluation, maintaining that BLM also should have analyzed a larger tailings spill as an "effect" of the project and, because BLM relied on the FEIS, which did not do so, BLM's Tier-1 evaluation is deficient.[127]  Federal Defendants contend that "BLM met ANILCA's requirement to evaluate the effects of the Project on subsistence uses and needs" by "consider[ing] and disclos[ing] the impacts of a tailings dam failure."[128]

Section 810's procedural requirements are similar to NEPA's; pursuant to its terms, an agency proposing an action resulting in the "use, occupancy, or disposition of public lands" must evaluate that action's effects on "subsistence uses and needs."[129]  Due to their similarities, courts have analyzed the procedural requirements of NEPA and ANILCA under the same standard.[130]  Because the Court finds that the Corps should have considered a larger tailings spill as a reasonably foreseeable effect of the mine, pursuant to Section 810, BLM also should have

---

[126] AR_0001407–08.

[127] Docket 59 at 29–30; Docket 82-2 at 20 ("Tribes challenge only Defendants' compliance with section 810's Tier 1 requirements—separate requirements for subsistence evaluations at the outset.").

[128] Docket 61 at 32.  Intervenor-Defendants Donlin and the State make similar arguments.  Docket 70 at 26–28; Docket 75 at 19–21.

[129] 16 U.S.C. § 3120(a).

[130] *See, e.g., City of Tenakee Springs v. Clough*, 915 F.2d 1308, 1310–12 (9th Cir. 1990) (evaluating adequacy of EIS's consideration of alternatives under NEPA and ANILCA together); *Alaska Wilderness Recreation & Tourism Ass'n v. Morrison*, 67 F.3d 723, 731 (9th Cir. 1995) (same); *Sierra Club v. Penfold*, 664 F. Supp. 1299, 1307 (D. Alaska 1987) ("NEPA case law is helpful in interpreting § 810.").

Case No. 3:23-cv-00071-SLG, *Orutsararmiut Native Council, et al. v. U.S. Army Corps of Engineers, et al.*
Decision and Order
Page 27 of 36

assessed a larger tailings spill as an "the effect of such use . . . [of public lands] on subsistence uses and needs."[131]  BLM's failure to do so violated § 810 of ANILCA.

### III.    Clean Water Act

Congress enacted the CWA "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."[132]  To achieve this goal, the CWA prohibits the discharge of any pollutant into navigable waters unless authorized by a permit.[133]  Section 404 of the CWA governs permitting for the discharge of dredged or fill material into navigable waters.[134]  The Corps is responsible for issuing Section 404 permits, and it does so according to EPA's Section 404(b)(1) Guidelines.[135]  Those guidelines state in relevant part: "[N]o discharge of dredged or fill material shall be permitted which will cause or contribute to significant degradation of the waters of the United States."[136]  The regulation enumerates "effects" that should be considered in assessing "degradation related to the proposed discharge," which include

---

[131] 16 U.S.C. § 3120(a).

[132] 33 U.S.C. § 1251(a).

[133] *See* 33 U.S.C. § 1311(a).  The CWA defines "navigable waters" as "the waters of the United States."  33 U.S.C. § 1362(7).  "Waters" as used in the CWA "encompasses 'only those relatively permanent, standing or continuously flowing bodies of water forming geographic[al] features that are described in ordinary parlance as streams, oceans, rivers, and lakes.'"  *Sackett v. EPA*, 598 U.S. 651, 671 (2023) (quoting *Rapanos v. United States*, 547 U.S. 715, 739 (2006) (plurality opinion)).

[134] *See* Federal Water Pollution Control Act Amendments of 1972, Pub. L. No. 92-500, § 404, 86 Stat. 816, 884; 33 U.S.C. § 1344.

[135] *See* 33 C.F.R. § 320.4(a)(1) ("For activities involving 404 discharges, a permit will be denied if the discharge that would be authorized by such permit would not comply with the [EPA's] 404(b)(1) guidelines.").

[136] 40 C.F.R. § 230.10(c).

Case No. 3:23-cv-00071-SLG, *Orutsararmiut Native Council, et al. v. U.S. Army Corps of Engineers, et al.*
Decision and Order
Page 28 of 36

"[s]ignificantly adverse effects of the discharge of pollutants on human health or welfare, . . . life stages of aquatic life and other wildlife . . . , aquatic ecosystem diversity, productivity, and stability . . . , [and] recreational, aesthetic, and economic values."[137]  In determining whether a discharge will significantly degrade the waters of the United States, the Corps considers "the potential short-term or long-term effects of a proposed discharge of dredged or fill material on the physical, chemical, and biological components of the aquatic environment," including the secondary effects on an "aquatic ecosystem that are associated with a discharge of dredged or fill materials."[138]

> Some examples of secondary effects on an aquatic ecosystem are fluctuating water levels in an impoundment and downstream associated with the operation of a dam, septic tank leaching and surface runoff from residential or commercial developments on fill, and leachate and runoff from a sanitary landfill located in waters of the U.S.[139]

"The Kuskokwim River subsistence fishery is one of the largest in Alaska."[140]

"[S]pecies of importance to subsistence fisheries in the Kuskokwim River drainage include . . . rainbow smelt."[141]  In the spring, rainbow smelt migrate from the

---

[137] 40 C.F.R. § 230.10(c)(1)-(4).

[138] 40 C.F.R. § 230.11(h)(1).

[139] 40 C.F.R. § 230.11(h)(2).

[140] AR_0022327.

[141] AR_0022364.

Case No. 3:23-cv-00071-SLG, *Orutsararmiut Native Council, et al. v. U.S. Army Corps of Engineers, et al.*
Decision and Order
Page 29 of 36

Kuskokwim Bay up the Kuskokwim River to spawn.[142] "Spawning generally occurs during a brief one- to two-day period in the vicinity of Lower and Upper Kalskag, [and] . . . [f]ertilized eggs adhere to river substrates and hatch in less than a month."[143] In the FEIS, the Corps "concluded that while there would be impacts to the Kuskokwim River, with implementation of the rainbow smelt monitoring program, the communication program, and the subcommittees under [the Donlin Advisory Technical Review and Oversight Committee], there would be no significant degradation of [the] Kuskokwim River . . . ."[144]

Plaintiffs maintain that the Corps violated the CWA because it "relied on monitoring and data collection, communication with subsistence users, and advisory subcommittees" to mitigate the impacts from barging to rainbow smelt and to find that Donlin's discharge of fill would not significantly degrade the Kuskokwim River.[145] But, Plaintiffs argue, "[t]hese measures fail to mitigate potential barge impacts on rainbow smelt" and "[r]eliance on them was therefore arbitrary."[146]

Federal Defendants counter that Plaintiffs "misconstrue the Corps' statement that there would be no significant degradation with the implementation of three proposed design features to imply that significant degradation would occur but for

---

[142] AR_0022367.

[143] AR_0022367.

[144] AR_0001024.

[145] Docket 59 at 41–42.

[146] Docket 59 at 42.

Case No. 3:23-cv-00071-SLG, *Orutsararmiut Native Council, et al. v. U.S. Army Corps of Engineers, et al.*
Decision and Order
Page 30 of 36

those design features."[147]  In any event, Federal Defendants asserts that "the Corps properly considered all of Donlin's proposed design features and reasonably concluded that they will minimize impacts to rainbow smelt."[148]  Intervenor-Defendants Donlin, Calista, and the State maintain that barge traffic on the Kuskokwim River is not related to the discharge of fill into waters of the United States and therefore the Corps was not required to consider barging impacts when determining whether Donlin's discharge activity would significantly degrade waters of the United States.[149]  In their reply, Plaintiffs respond that "[t]he Corps . . . properly considered Donlin's barging as a secondary effect under the Clean Water Act" because the Section 404 permit authorizes the construction of the Jungjuk Port and the port's "purpose is precisely to receive Donlin's barges and to load and offload cargo, diesel, cyanide, mercury, and other materials."[150]

The Court agrees with Intervenor-Defendants that the impact of barging on the

---

[147] Docket 61 at 47 (internal citation omitted).

[148] Docket 61 at 50.

[149] Docket 70 at 34–36 (internal citations omitted) (arguing that "transportation activities bringing supplies upriver to the Project via barges . . . do not involve any discharges of dredged or fill material or require section 404 permits  and are not in any way 'associated with a discharge' subject to a Corps permit"; therefore, "[a]ny environmental impacts from increased barging . . . were therefore outside the scope of the Corps' jurisdiction and the significant degradation analysis"); Docket 74 at 20 ("[C]onsideration of the potential impacts on the river from barging activities lies wholly outside of the Corps' purview in evaluating compliance with the CWA Section 404 Guidelines."); Docket 75 at 28 ("[I]ncreasing barge activity along the Kuskokwim will not require any discharge of dredge or fill material. Consequently, the Corps did not and was not required to perform a significant degradation analysis under CWA Section 404(b)(1) as it relates to barge activity.").

[150] Docket 82-2 at 40 (first citing 40 C.F.R. § 230.11(h) (2018); then citing *Fox Bay Partners v. U.S. Corps of Eng'rs*, 831 F. Supp. 605, 609–10 (N.D. Ill. 1993); and then citing *Stewart v. Potts*, 996 F. Supp. 668, 683 (S.D. Tex. 1998)).

Case No. 3:23-cv-00071-SLG, *Orutsararmiut Native Council, et al. v. U.S. Army Corps of Engineers, et al.*
Decision and Order
Page 31 of 36

Kuskokwim River is neither "related to the proposed discharge," nor is it a secondary effect to an "aquatic ecosystem that [is] associated with a discharge of dredged or fill materials."[151]   The examples of secondary effects provided in the regulations demonstrate that secondary effects are those that emanate from the fill itself, whether it be a change in water levels due to a dam or leaching from fill placed in waters of the United States.[152]   Therefore, barge activity is not a secondary effect of Donlin's discharge of fill into the Kuskokwim River to build the port.

Other courts have held similarly.  In *Red Lake Band of Chippewa Indians v. United States Army Corps of Engineers*, the plaintiffs challenged the Corps' grant of a Section 404 permit because the Corps purportedly failed to "assess a potential oil spill that could result from the operation of the new pipeline."[153]   The district court held that the Corps was not required to do so, and "the Corps' analysis of potential 'significant degradation of the waters of the United States' was appropriately tailored to potential effects arising from the 'discharge of dredged or fill material' authorized by its permits."[154]   And, in *City of Shoreacres v. Waterworth*, the Fifth Circuit held that 40 C.F.R. § 230.10(c) did not require the Corps to consider the effects of a cargo and

---

[151] 40 C.F.R. §§ 230.10(c)(1), 230.11(h)(1).

[152] *See* 40 C.F.R. § 230.11(h)(2).

[153] *Red Lake Band of Chippewa Indians v. U.S. Army Corps of Eng'rs*, 636 F.Supp.3d 33, 68 (D.D.C. 2022).

[154] *Id.* (quoting 40 C.F.R. § 230.10(c)(1)).

Case No. 3:23-cv-00071-SLG, *Orutsararmiut Native Council, et al. v. U.S. Army Corps of Engineers, et al.*
Decision and Order
Page 32 of 36

Case 3:23-cv-00071-SLG   Document 99   Filed 09/30/24   Page 32 of 36

cruise ship terminal "once it begins operations."[155]  The plaintiffs in that case argued that the Corps should have considered that "the scope of shipping to and from the . . . terminal will eventually lead to deepening the Houston Ship Channel from forty-five to fifty feet to accommodate the larger vessels that are expected to traverse the oceans in the future."[156]  The Fifth Circuit disagreed, holding that it was "not an abuse of discretion for the Corps to construe the CWA and its regulations as not requiring the Corps to consider any future deepening of the Houston Ship Channel as an adverse environmental consequence of issuing a dredge and fill permit to the Port."[157]

In their reply, Plaintiffs maintain that "[t]he Corps . . . properly considered Donlin's barging as a secondary effect under the Clean Water Act," citing, *inter alia*, *Fox Bay Partners v. United States Army Corps of Engineers*.[158]  In that case, the Corps denied a Section 404 permit to a developer who wanted to build a 512-slip private marina, which would involve constructing piers, boat docks, and boat ramps.[159]  The Corps found that the project, "in combination with marinas, boat launches and private boat docks that have already been permitted and with similar projects that are reasonably foreseeable in the near future, would result in significant, cumulative, adverse impacts," in large part due to "the potential increase in the

---

[155] *City of Shoreacres v. Waterworth*, 420 F.3d 440, 449 (5th Cir. 2005).

[156] *Id.*

[157] *Id.* at 449–50.

[158] Docket 82-2 at 40 (citing 831 F. Supp. 605, 609–10 (N.D. Ill. 1993)).

[159] *Fox Bay Partners*, 831 F. Supp. at 606.

Case No. 3:23-cv-00071-SLG, *Orutsararmiut Native Council, et al. v. U.S. Army Corps of Engineers, et al.*
Decision and Order
Page 33 of 36

Case 3:23-cv-00071-SLG   Document 99   Filed 09/30/24   Page 33 of 36

number of large power boats that the marina would introduce to, and the effects these boats would have on, the aquatic ecosystem of the Fox River and Chain-O-Lakes."[160] The developer "challenge[d] these findings as being insufficiently connected to [the] proposed 'discharge' of dredged material, alleging that the Corps is attempting to regulate an activity—boating and recreational water use—that is not within its regulatory jurisdiction."[161] The district court interpreted 40 C.F.R. § 230.10 and 230.11 as requiring the Corps to "look not only at the direct effects of a discharge but also at the indirect effects."[162] The district court held that "[t]he Corps applied the correct legal analysis under the CWA" and "rationally concluded that the project was contrary to the public interest."[163]

In *Friends of Back Bay v. United States Army Corps of Engineers*, a district court distinguished *Fox Bay Partners* as "an out-of-circuit case that has never been cited for the proposition that a boat ramp's secondary effects include future boating activity."[164] In *Friends of Back Bay*, plaintiffs claimed that the Corps should have considered "the negative impacts that will be caused by an increase in boating activity" in determining whether to grant a Section 404 permit for construction of a

---

[160] *Id.* at 607.

[161] *Id.* at 608–09.

[162] *Id.* at 609.

[163] *Id.* at 610.

[164] *Friends of Back Bay v. U.S. Army Corps of Eng'rs*, Case No. 2:10-cv-270, 2011 WL 12473234, at *18 (E.D. Va. Feb. 9, 2011).

Case No. 3:23-cv-00071-SLG, *Orutsararmiut Native Council, et al. v. U.S. Army Corps of Engineers, et al.*
Decision and Order
Page 34 of 36

mooring facility and boat ramp.[165] The district court disagreed, finding that it "cannot conclude an increase in boating activity resulting from the marina is a secondary effect of the permit's boat ramp."[166]

The Court is more persuaded by *Red Lake Band of Chippewa Indians*, *City of Shoreacres*, and *Friends of Back Bay*; consistent with those cases and the Court's reading of the applicable regulations, the Court finds that barging activity on the Kuskokwim does not constitute a secondary effect of Donlin's proposed discharge activity associated with the port. Therefore, the Corps did not violate the CWA in its consideration of the impact of barging on rainbow smelt in the Kuskokwim River.

## IV. Remedy

Plaintiffs ask the Court to enter a declaratory judgment stating that the FEIS, JROD, Section 404 permit, and right-of-way lease are unlawful, and they seek vacatur of these agency actions.[167] Federal Defendants maintain that the issue of remedy and whether vacatur is warranted should be addressed in supplemental briefing.[168] The Court agrees that supplemental briefing is appropriate and any prejudice to Plaintiffs as a result of this delay is mitigated because construction of the mine has not begun.[169]

---

[165] *Id.* at *1, 17.

[166] *Id.* at *19.

[167] Docket 59 at 46.

[168] Docket 61 at 51.

[169] *See* Docket 59 at 47; Docket 70 at 46.

**CONCLUSION**

In light of the foregoing, IT IS HEREBY ORDERED that:

1. Plaintiffs' request for declaratory relief is GRANTED in part as follows:  The FEIS violates NEPA and ANILCA by failing to consider a larger tailings spill. It is therefore "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[170]  Plaintiffs' request for declaratory relief on their remaining claims—that the FEIS's treatment of the State HIA violated NEPA and that the Section 404 permit violated the CWA—is DENIED.

2. Each party may file a supplemental brief addressing the proper remedy in this case **within 21 days of the date of this order; such brief shall not exceed 15 pages**.  Each party will then have **an additional 14 days to file a response, not to exceed 8 pages**.

DATED this 30th day of September 2024, at Anchorage, Alaska.

*/s/ Sharon L. Gleason*
UNITED STATES DISTRICT JUDGE

---

[170] 5 U.S.C. § 706(2)(A).

Case No. 3:23-cv-00071-SLG, *Orutsararmiut Native Council, et al. v. U.S. Army Corps of Engineers, et al.*
Decision and Order
Page 36 of 36

Case 3:23-cv-00071-SLG   Document 99   Filed 09/30/24   Page 36 of 36